**MAGELLAN CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 92–862C.**

United States Court of Federal Claims.

Jan. 12, 1993.

John S. Pachter, Vienna, VA, for plaintiff. Jonathan D. Shaffer, and Carl T. Hahn, of counsel.

Dean L. Grayson, with whom were Asst. Atty. Gen., Stuart M. Gerson and David M. Cohen, Washington, DC, for defendant. LtC. Leo B. Wegemer and Maj. Wyckliffe S.G. Furcron, of counsel.

### ORDER ON MOTION
### FOR PRELIMINARY
### INJUNCTION

BRUGGINK, Judge.

On December 22, 1992, Magellan Corporation ("Magellan") filed an application for a temporary restraining order ("TRO") and a motion for a preliminary injunction. At issue is the procurement of Precision Lightweight Global Positioning Receivers ("PLGR") being conducted by the Joint Program Office of the Department of Defense on the basis that the PLGR is a nondevelopmental item ("NDI"). The procurement is proceeding in two phases. Phase one, now complete, involved testing of the devices submitted by the suppliers, along with an evaluation of their technical proposals. Suppliers that submitted techni-

cally satisfactory PLGR's and backup data were to be invited to submit bids. Following completion of phase one, Magellan was notified that its submission did not qualify. Magellan sought a TRO to block the bid opening. After consultation with counsel, the court deemed a restraining order to be unnecessary, as the event of greatest immediate concern to Magellan was the bid opening, then assumed to be scheduled for January 7, 1993. The date of bid opening was subsequently moved to January 11, 1993. Accordingly, Magellan's motion for expedited discovery was granted, as were two motions for protective orders. The court held a closed hearing on the motion for a preliminary injunction on January 6–7, 1993. On January 8, 1993, the court announced its decision to deny the motion and stated its reasons. At defendant's request, those reasons are now expressed in this opinion.

■ The court has the authority to enter an injunction blocking the award to any bidder other than Magellan. 28 U.S.C. § 1491(a)(3) (1988). The limited question is whether the status quo ante should be maintained while the plaintiff undertakes discovery and proofs on its request for permanent relief. Prior decisions of this court and of the United States Court of Appeals for the Federal Circuit, however, make it clear that such authority should not be routinely exercised. As the Federal Circuit wrote in *United States v. John C. Grimberg Co.*, 702 F.2d 1362 (Fed.Cir. 1983), equitable powers "should be exercised in a way which best limits judicial interference in contract procurement." *Id.* at 1372.

That is not to say that relief is unavailable. Clearly it must be. Nor is the plaintiff's burden of proof only satisfied by "clear and convincing evidence," as the government suggests. *Quality Transp. Servs., Inc. v. United States*, 12 Cl.Ct. 276, 281 (1987). The standard is high enough without that additional burden. But the drift of the cases is clear: courts should not enjoin a procurement lightly.

■ Although Rule 65, Rules of the Court of Federal Claims does not contain a checklist to aid the court in determining whether to issue a preliminary injunction, the cases and commentaries have isolated four relevant factors: degree of immediate irreparable harm to the plaintiff; degree of harm to the party to be enjoined; the impact of the injunction on public policy considerations; and the likelihood of plaintiff's ultimate success on the merits. *See We Care, Inc. v. Ultra–Mark, Int'l Corp.*, 930 F.2d 1567, 1570 (Fed.Cir.1991); *see also Brown v. Chote*, 411 U.S. 452, 456, 93 S.Ct. 1732, 1735, 36 L.Ed.2d 420 (1973). These competing elements must be simultaneously weighed. In the court's view, therefore, it is not fatal to Magellan's effort to obtain interim relief, for example, that it cannot demonstrate a "significant" or "strong" likelihood of success. *See Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir.1953).

■ 1. *Irreparable harm to the plaintiff.* The relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction. If the plaintiff's sole interest is in being reintroduced into the competition for the NDI procurement, then in reality, it does not have an adequate equitable or legal remedy in the future. For instance, if the procurement were to proceed, a source was to be selected, and six months later the court were to find that Magellan had been improperly excluded, it is doubtful that the court would cancel the award and require further discussions with Magellan. Nor could Magellan recover as damages its potential lost profits. In such a scenario, Magellan would be entitled to prove and recover its bid preparation costs (which it alleges are not insubstantial), but it would lose out on the opportunity to participate in this large procurement on the particular type of hardware that is its primary livelihood. In that sense, the harm to plaintiff is significant.

Weighing against the irreparable harm factor are two considerations. The first is the fact that an independent ground upon which Magellan intends to seek permanent relief is that the procurement was in violation of applicable law from the outset; that

this should not have been an NDI procurement. If that is the case, one of the remedies Magellan will seek is cancellation of the entire procurement, even after award to some other supplier. Admittedly, that would not be the inevitable remedy, but it is a possible remedy, and its very potentiality discounts the harm to plaintiff. The second minimizing factor is the large difference between General Garner's testimony concerning the military's need and funding authorization for PLGR's, compared with what would appear to be the maximum number of PLGR's that can be ordered under this contract. Under the circumstances, there may have to be reprocurements. Thus, plaintiff may have another opportunity to supply its product.

2. *Harm to the government.* The government argues that time is of the essence in the award. General Garner tells us that PLGR's may become an essential technology in future combat. We have no reason to doubt that. The urgency is somewhat minimized by the long duration of the solicitation process and the relatively long period of time until production. Nevertheless, a holding for plaintiff would result in a delay in implementation that would be solely attributable to this injunction. If we were dealing with a procurement for toilet seats or belt buckles, then delaying for three weeks a procurement that will evolve over three years would be *de minimis*. In this case, however, we are dealing with hardware that, according to General Garner, can give our armed forces a critical advantage in combat. In assessing the need for injunctions, the court must give due regard to the interests of national security. 28 U.S.C. § 1491(a)(3).

3. *Public policy considerations.* The various public policy considerations do not shed a great deal of light on the result. The public has an interest in honest, open and fair competition, and if plaintiff is improperly excluded, that interest is compromised. The more qualified bidders there are, the greater the likelihood that the public will end up paying less for PLGR's. On the other hand, the legislative history to the court's injunction statute indicates that Congress felt that the government should be able to conduct procurements expeditiously and with as little judicial intrusion as possible into the government's discretion. Thus, neither party holds the upper hand as to this factor.

■ 4. *Likelihood of success.* It is useful, in looking at this element, to remember what Magellan ultimately must prove in order to get a permanent injunction. Magellan will have to demonstrate either that there was no rational basis for the decision to treat its PLGR as unacceptable or that a prejudicial violation of a procurement statute or regulation occurred. *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 725 (1987), *aff'd* 854 F.2d 464 (Fed.Cir. 1988). Lack of a rational basis means that the decision was arbitrary or capricious. *See Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1206–07 (1974). In making that determination, the court does not decide from its own perspective if it thinks the tests could have been conducted differently, or if something should have been overlooked. The sole question is whether the decision of the Contracting Officer ("CO") to exclude Magellan from the second stage of the procurement process was arbitrary or capricious, recognizing that the CO should be given discretion in resolving disagreements about technical matters. As to violations of regulations or statutes, the court has been presented with no evidence or argument on that point so far.

■ Magellan concedes that if a single legitimate basis for rejecting Magellan's submission exists, the fact that the government was wrong as to other asserted grounds is irrelevant. In such an instance, the court would deny relief. This puts the government in the enviable position of being able to rely on, but without having to prove absolutely, any one of several alleged deficiencies it stated in the December 14 rejection letter. It merely has to show that the CO's rejection on one of those bases was neither illegal nor arbitrary.

With that in mind, we examine the particular alleged deficiencies that were the focus of the hearing. They fall into two sets.

The first set contains alleged deficiencies concerning the bid sample tests:

### A. *Immersion testing.*

The government had the right to insist on stressed testing. Magellan was notified on November 12, 1992, that Unit 100 had failed. This news did not surprise Magellan because the unit had been made using the old method of silicone application. Magellan submitted a new device, which failed on November 24, 1992. On November 30, 1992, Magellan was again notified. A third sample was sent on December 7, 1992. The sample was tested, although it was unstressed. It failed. Thus occurred three failures without any subsequent successes. Plaintiff now offers that there was something wrong with the test, or if not, it could fix the device if given the opportunity. But what is the likelihood that this theory will ultimately prove successful? The court has heard nothing to suggest that the tests actually were conducted improperly. Furthermore, assuming the tests were accurate, Magellan has no ready modification to offer. Based on these facts, the court concludes that there is a small likelihood of success.

### B. *Battery sizing.*

This test pertained to the government's legitimate concerns about having the battery slide in and out easily. When the government measured the dummy battery, it was within specifications. Magellan used a standard battery, and it tried that battery in the device that was tested. Nevertheless, during government tests, the dummy had to be pushed to fit. Plaintiff claims that either the second device tested was misaligned during manufacture, or the government's dummy battery was too large, or the batteries Magellan was using were at the low end of the tolerance range, combined with a battery compartment that was designed to be too small. None of these things strike the court as likely. The device tested has since been destroyed. If there is a trial on this issue during which the dummy cylinder can be measured and shown to be within specifications, and if Magellan's own batteries are shown to be

within specification, then why should Magellan necessarily win? At that point, the only other variable would be the destroyed PLGR. It would be no answer to say that some other machine works today. The government is entitled to rely on the device that is submitted at the cutoff date, particularly when there had been an earlier unsuccessful test, and when Magellan had been invited to attend subsequent battery tests. In sum, it is a problematic area, but not one on which the court believes Magellan is likely to be successful, unless there is some legal obligation to allow a new round of tests, which has not been shown at this point.

### C. *Battery venting.*

Here there is no question of failure, as in the case of immersion. In this case, Magellan has a weak argument in terms of the time of notification, and the quality of the second test, both because it was notified earlier, and also because the lack of earlier government explanation can be attributed to Magellan's incorrect explanation of its venting technique.

What we are left with is plaintiff's assertion that there was an unexplained failure of the last test. The court has no feel for what it would take to make the device compliant. Magellan's counsel says it is a simple fix, requiring only minor modification, but the court is less sanguine on that contention. It views as very slim the likelihood of getting, within the period of a brief injunction, an explanation that would have justified resubmission and retesting within a five-day period in early December.

### D. *Foliage attenuation.*

Here again, there is no proof of compliance, either with the test requirement, or with the related certification in the technical proposal. On the face of it, there is a plain failure to meet both requirements. Even according to Magellan, it has no more than a hope that its machine is sensitive at −170dBW. Magellan only tested its PLGR down to −169dBW, and the evidence is that a one dBW difference is not insignif-

icant. Although some question has been raised about the government's testing, it is mere speculation at this point. Both Magellan and the government used a 3a receiver as a control. We are unaware whether either control receiver was left on throughout testing. Dr. MacMillan stated that a 3a receiver would not interfere with the test results; however, Bruce Pederson, plaintiff's expert, stated that it might. Plaintiff hoped to get a better result than it could achieve on its own when tests were conducted at the government's testing lab, one of the premiere such facilities in the world. Plaintiff's hopes are based in part on its confidence in the government lab and its ability to provide a cleaner environment. The likelihood is slim that the court would hold that the CO was arbitrary in failing the device on this issue because of the possibility that the government tests were inaccurate.

The second set of alleged deficiencies relates to evaluation of the Technical Proposal:

A. *Estimated horizontal error notification capability.* The court is willing to give the benefit of the doubt to Magellan on whether the December 7, 1992, submission alleges that the machine notifies the user within fifteen seconds, although frankly the tapes the court briefly examined are less than self-evident. They do not appear to contain any of the required analysis.

B. *Default to present position requirement.* Apparently Magellan's initial submissions were not capable of doing what the government wanted. At some point, Magellan changed its software. Mr. Hoffman, President of Magellan, testified that the PLGR now does what it is supposed to do. Major Fernandez has a legitimate interest, however, in paperwork that makes the necessary assertions. The December 7 submission suggests that Magellan was not technically in compliance in providing analysis, testing, or backup data. This would seem, however, to be the kind of deficiency that would be easy to fix, if in fact the device works. In sum, Magellan may have

an argument that the government should not reject exclusively on this one item.

C. *Environmental testing.* In terms of the technical proposal, Magellan's real problem is that it submitted no data on three elements of the environmental testing of the remote antenna. In the court's view, Magellan should not be entitled to any presumption of a right to supply missing data when, after having been asked on more than one occasion, nothing was sent. Missing data is different from inadequate data. Without any evidence of a prior history to explain why plaintiff thought, or was led to believe, that this data was unnecessary, this deficiency would seem to be a per se basis for supporting the government's position.

Again, we are left with Magellan's argument that it should have had another chance to submit technical proposal data and to evaluate the government's testing and work out any final deficiencies. That argument would be telling if either one of two circumstances existed. Unfortunately for plaintiff, there is no evidence of either. The first would be the existence of a contractual or other legal duty for the government to have kept testing open to allow additional changes beyond the December 7 cutoff date. From what the court has seen thus far, that opportunity probably applies to the Facility of Use Requirement alone, or, more generally, to minor deviations. But as to environmental testing requirements, the government has the right to enforce reasonable cutoff dates, and the court was presented nothing to call the final date into question.

The other missing circumstance would be if Magellan had a ready explanation for how it complies with the technical requirements and meets the tests. But it does not. It speculates that it might meet the tests and standards if it had more time to work on its submission. If plaintiff had received no discussions or feedback from the agency, the court would be more sympathetic to the request for preliminary injunctive relief. *A.R.E. Mfg. Co.*, B–224086, 86–2 CPD ¶ 395, cited by plaintiff, points out that in a two-step procurement, the

 

agency must make reasonable efforts to qualify as many technical proposals as is possible. But the court's impression, based on the evidence submitted thus far, is that the agency was fair-handed, offered a great deal of detailed feedback, and was not simply going through the motions with Magellan.

Clearly, the likelihood of success on the issue of whether Magellan should not have been rejected is very small. Although this factor is usually stated in terms of the need to show a "strong likelihood of success," as stated above, however, absence of such strong proof is not necessarily fatal to Magellan. The Federal Circuit has stated that this is not a rigid concept. It must be weighed in conjunction with the proof on the other factors. The court has endorsed the following language: "the chance of success must be 'better than negligible', even if harm is very great." *Standard Havens Prods., Inc. v. Gencor Indus.*, 897 F.2d 511, 512–13 (Fed.Cir.1990), (citing *Omega Satellite Prods. v. City of Indianapolis*, 694 F.2d 119, 123 (7th Cir.1982)). Also, if harm to the injunction applicant is sufficiently serious, it is only necessary that there be a "fair chance of success on the merits." *Id.*, (citing *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 526 F.2d 86, 88 (9th Cir.1975)). Obviously these are imprecise standards, but what is shown is that if there is a very great risk to plaintiff and virtually no risk to defendant, then plaintiff only has to show a "fair chance of success."

In this case, based on the presentation thus far, Magellan does not have a fair chance of success on the question of whether its submission was technically qualified to proceed to step two. Consequently, even if there were no risk of harm to the government, fairness would not counsel granting the injunction. But here there is some risk shown to the government, particularly since the PLGR is a device actually used in combat.

## CONCLUSION

Weighing all these factors, an injunction should not issue. The disruption to the procurement process would not be justified in view of the very low possibility of success. Having denied the preliminary injunction, however, the court points out that these findings and conclusions are only relevant to the motion for a preliminary injunction. They are not conclusive on the permanent injunction. Nor do they have any bearing on the separate issue of whether this should have been an NDI procurement.

The parties are directed to file by January 22, 1993, a proposal, joint if possible, outlining expedited pretrial proceedings and discovery to bring the balance of the case to prompt conclusion.