PGBA, LLC, Plaintiff,

v.

The UNITED STATES, Defendant,

Wisconsin Physicians Service Insurance
Corporation, Intervening–
Defendant.

No. 03–1986C.

United States Court of Federal Claims.

Filed Under Seal: Sept. 15, 2003.

Reissued: Sept. 29, 2003 [1].

Kathleen Elizabeth Karelis, Miller & Chevalier Chartered, Washington, D.C., for plaintiff.

Margaret Evalyn McGhee, U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General Peter D. Keisler, for defendant.

Steven Samuel Diamond, Arnold & Porter, Washington, D.C., for intervening-defendant.

## ORDER

ALLEGRA, Judge.

This contract case is before the court on plaintiff's motion for a preliminary injunction.

1. This opinion was issued under seal on September 15, 2003. The parties were given an opportunity to propose redactions; however, no such redactions were suggested and, therefore, the order is now published in its original form (with some minor corrections).

After careful consideration of the briefs filed by the parties, the oral argument, and for the reasons discussed below, the court hereby **GRANTS** plaintiff's motion for preliminary injunction.

## I. FACTS[2]

In an effort to improve the Military Health Care System, the Department of Defense, through its TRICARE Management Activity (TMA), has developed a plan to streamline the current health care regime and convert what are currently eleven TRICARE regions, administered by four Managed Care Support (MCS) contractors, into three, which are to be administered under new so-called "T–Nex" contracts. As part of this transformation, the plan carves out certain areas of health care administration and management to be provided through separate national contracts. One of these is the TRICARE Dual–Eligible Fiscal Intermediary Contract (TDEFIC contract), which will provide services for individuals, known as TRICARE For Life beneficiaries, who are entitled to benefits both under TRICARE and Medicare. Currently, the four TRICARE MCS contractors all subcontract the claims processing portion of the MCS contract, and plaintiff, PGBA, LLC (PGBA), and intervening-defendant, Wisconsin Physicians Service Insurance Corp. (WPSI), are currently the only two subcontractors performing this work. Consequently, all TRICARE For Life beneficiary claims are processed by either plaintiff or intervening-defendant.

Both plaintiff and intervening-defendant submitted bids to the TMA seeking the TDEFIC contract. On July 25, 2003, TMA awarded the TDEFIC contract to intervening-defendant. As an unsuccessful bidder, plaintiff filed a protest with the General Accounting Office (GAO) on August 8, 2003. Two days previous, on August 6, 2003, TMA had issued a stop order in response to a protest filed on August 5, 2003, by Unisys Corporation, another unsuccessful TDEFIC bidder, as mandated by the automatic stay provision of the Competition in Contracting Act of 1984 (CICA). On August 16, 2003, TMA's Director of Acquisition Management and Support issued a memorandum explaining TMA's decision to override the CICA automatic stay pursuant to 31 U.S.C. § 3553(d)(3)(C). In that memorandum, the Director invoked both of the bases listed in section 3553(d)(3)(C) to justify authorizing the resumption of performance under the TDEFIC contract, namely: "performance of the contract is in the best interests of the United States," and "urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest."

On August 22, 2003, plaintiff filed a complaint with this court contesting the override decision, accompanied by, *inter alia*, a motion for preliminary injunction, seeking to enjoin TMA from overriding the automatic stay imposed by CICA. On September 3, 2003, defendant and intervening-defendant filed their responses to plaintiff's motion, and on September 5, 2003, plaintiff filed its reply. On September 8, 2003, oral arguments were held on plaintiff's motion for preliminary injunction.

## II. DISCUSSION

■ Plaintiff seeks a preliminary injunction essentially enjoining TMA from overriding the automatic stay imposed by CICA, thereby barring further performance under the awarded contract. In order to obtain a preliminary injunction, plaintiff must demonstrate: (i) a likelihood of success on the merits; (ii) the harm to plaintiff outweighs the harm to defendant; (iii) the public interest is served by enjoining defendant; and (iv) irreparable injury to plaintiff if defendant is not enjoined, including, but not limited to, the absence of an adequate remedy at law. *See Delbert Wheeler Constr., Inc. v. United States*, 39 Fed.Cl. 239, 251 (1997), *aff'd*, 155 F.3d 566 (Fed.Cir.1998). No one factor is dispositive to the court's inquiry as "the weakness of the showing regarding one factor may be overborne by the strength of the

**2.** Owing to the urgent need of the parties for a ruling in this matter, the court's recitation of the facts and law is necessarily brief.

others." *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993). Plaintiff bears the burden of proving it is entitled to preliminary injunctive relief by clear and convincing evidence. *See Delbert Wheeler,* 39 Fed.Cl. at 251; *Bean Dredging Corp. v. United States,* 22 Cl.Ct. 519, 522 (1991).

The court will consider the parties' arguments regarding these injunctive elements *seriatim.*

## A. Likelihood of Success on the Merits

Initially, the court must determine whether it is likely that it would overturn the override decision as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 28 U.S.C. § 1491(b)(4); *see also* 5 U.S.C. § 706(2)(A). Regarding this standard, which, as noted, is drawn from the APA, the Supreme Court has stated:

Section 706(2)(A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted); *see also Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057–58 (Fed.Cir. 2000); *Overstreet Elec. Co. v. United States,* 47 Fed.Cl. 728, 731 (2000). By its very definition, this standard recognizes the possibility that there exists a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Resources*

*Defense Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). The Supreme Court burnished these twin requirements in *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), identifying four grounds upon which a holding of arbitrary and capricious agency action could be based:

■f the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 43, 103 S.Ct. 2856; *see also OMV Med., Inc. v. United States,* 219 F.3d 1337, 1343 (Fed.Cir.2000); *Overstreet,* 47 Fed.Cl. at 731 n. 6.

■ Turning to the merits, the "automatic stay" provisions of CICA require federal agencies, upon receiving notice, within 10 days of a contract award, that the award is being protested, to "direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under the contract." 31 U.S.C. § 3553(d)(3)(A)(ii). This section further provides that "[p]erformance [of the contract] may not be resumed while the protest is pending." 31 U.S.C. § 3553(d)(3)(B). In the conference report to the Deficit Reduction Act of 1984, of which CICA was a part, the conferees wrote that, as a part of strengthening the bid protest function at the GAO, "a strong enforcement mechanism is necessary to insure that the mandate for competition is enforced." H.R. Conf. Rep. No. 98–861 at 1435 (1984), U.S.Code Cong. & Admin.News 1984, pp. 697, 1080–81. The automatic stay was viewed as a key element of that mechanism. *See* H.R. Conf. Rep. No. 98–861 at 1435–36, U.S.Code Cong. & Admin.News 1984, pp. 697, 1080–81; H. Rep. No. 98–1157 at 23–25 (1984).[3] As noted by

---

**3.** These points were reemphasized in H. Rep. No. 99–138 (1985), which was issued the year after

CICA passed. Commenting on CICA, this report indicates that—

one commentator reviewing this legislative history, "CICA was given teeth in the form of an automatic stay of contract award or automatic suspension of contract performance in the case of post-award protests." Robert M. Hanson, "CICA Without Enforcement: How Procurement Officials and Federal Court Decisions Are Undercutting Enforcement Provisions of the Competition in Contracting Act," 6 Geo. Mason L.Rev. 131, 136 (1997).

Notwithstanding, CICA permits agencies, in some circumstances, to override the stay. Thus, with respect to post-award protests, the head of the contracting activity may authorize performance of a contract despite a protest, upon a "written finding" that—

(i) performance of the contract is in the best interests of the United States; or

(ii) urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest.

31 U.S.C. § 3553(d)(3)(C). A related provision provides that if the head of the contracting activity justifies continued performance on the ground that doing so is in the best interests of the United States, but the protest is subsequently sustained, the GAO is to recommend a remedy "without regard to any cost or disruption from terminating, recompeting, or reawarding the contract." 31 U.S.C. § 3554(b)(2).

In *RAMCOR Servs. Group, Inc. v. United States,* 185 F.3d 1286, 1291 (Fed.Cir.1999), the Federal Circuit held that this court has jurisdiction under 28 U.S.C. § 1491(b) to review an agency's override decision. There, the Federal Circuit determined that this court could review the merits of an override independent of any consideration of the merits of the underlying contract award, stating:

> The language of § 1491(b), however, does not require an objection to the actual contract procurement, but only to the "violation of a statute or regulation in connection with a procurement or a proposed procurement." The operative phrase "in connection with" is very sweeping in scope. As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction. Section 3553(c)(2) fits comfortably in that broad category.

*Id.* at 1289. The court also rejected the government's claim that this court lacked jurisdiction because no procurement statute was allegedly violated, stating that "an agency may 'violate' § 3553(c)(2) by issuing a written finding that does not meet the substantive review criteria of § 1491(b)(4)." *Id.* at 1290. As the court observed, the latter provision explicitly imports into this court's protest jurisdiction the standards set forth in section 706 of title 5. Noting that an objection to an override decision "falls squarely within the jurisdictional ambit of § 1491(b)(1)," the court concluded that "[a]lthough a contractor may instead pursue a district court action under the APA to seek redress for an agency's deficient § 3553(c)(2) override, that remedy does not alter the jurisdiction of the Court of Federal Claims" under section

[t]he act also establishes, for the first time in a statute, a strong enforcement mechanism through which contracts are held in abeyance while contractors appeal to the General Accounting Office (GAO) when they believe they have been unlawfully denied the opportunity to compete for the award of Government contracts. Congress included these bid protest provisions to help ensure that the mandate for competition would be followed and that vendors wrongly excluded from Federal contracts would receive fair relief.

*Id.* at 4. This report further noted that "Congress fully recognized that a major deficiency in the existing bid protest process was the inability to stop a contract award or contract performance while a protest was pending," observing that the result was that "[a]gencies ... often proceeded with their contracts, simply ignoring the protest process." *Id.* at 4–5. As a result, in those instances in which GAO recommended relief that involved staying performance, the agencies often rejected that recommendation, finding that it was in the "best interests" of the government to continue the contract. *Id.* The report then stated that "[a] key element of the Competition Act—an automatic stay of contract award or performance pending the Comptroller General's protest decision—was included to preclude such *faits accomplis* and to facilitate a fair and equitable remedy to vendors who are illegally denied Government contracts." *Id; see also Competition in Contracting Act of 1984: Hearings on H.R. 5184 Before the Subcomm. on Legis. and Nat'l Security of the House Comm. on Gov't Operations,* 98th Cong. 9–10 (1984).

1491(b), which, "by its terms provides alternative avenues for judicial review." *Id.*

Under *RAMCOR*, defendants agree that this court has jurisdiction to review a finding that "urgent and compelling circumstances" require an override. But, they contend that a finding that performance of the contract is in the "best interests of the United States" is not susceptible to judicial review because it constitutes an agency action that is "committed to agency discretion" by law. The quoted standard, they assert, derives from section 701 of title 5 and, indeed, has been applied by several courts in concluding that a "best interest" determination under section 3553(c)(2) is not reviewable under the Administrative Procedure Act (APA).[4] These decisions, however, must be contrasted with others—some from the same court—that have concluded that a "best interest" finding, like that of "urgent and compelling circumstances," is reviewable.[5] None of these decisions involve this court's jurisdiction under the Alternative Dispute Resolution Act (ADRA), 28 U.S.C. § 1491(b). Indeed, the closest this court has come to resolving this issue is in *SDS Int'l, Inc. v. United States,* 55 Fed.Cl. 363, 365 (2003), where the court cited, but did not adopt, decisions holding a "best interest" determination to be nonjusticiable, ultimately deciding that the finding in question was not arbitrary and capricious.

On balance, this court believes that a "best interest" finding in support of an override decision is reviewable. Initially, the court observes that the issue whether section 701 of the APA is applicable in ADRA cases is, at least in this instance, a red herring because even if it is not, this court generally is required to apply a comparable standard in determining whether a given issue is justiciable. *See, e.g., Baker v. Carr,* 369 U.S. 186,

198, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *see also Murphy v. United States,* 993 F.2d 871, 872 (Fed.Cir.1993), *cert. denied,* 511 U.S. 1019, 114 S.Ct. 1402, 128 L.Ed.2d 75 (1994); *Flores v. United States,* 51 Fed.Cl. 49, 51 n. 1 (2001). While defendants claim that the "best interest" finding is committed to agency discretion, section 3553 does not state this either *haec verba* or in so many words—indeed, this statute bears little resemblance to the types of statutes that generally have been held to produce nonreviewable decisions, most of which specifically refer to the agency's discretion and many of which have involved national security concerns.[6] In the court's view, this point was largely lost on the few courts holding that a "best interest" determination is nonreviewable. *See, e.g., Topgallant Group,* 704 F.Supp. at 266; *see also* Mark Riordan, "Federal Court Actions Challenging Agency Overrides of the CICA Stay," 23 Pub. Cont. L.J. 397, 403 (1994) (*"Topgallant's* rationale seems less than compelling").

This court, moreover, believes that there are standards by which to review the "best interest" finding, among them whether the assumptions or factual assertions upon which that finding is based are borne out by the record; and whether the factors relied upon by the contracting official were relevant or, conversely, whether factors relevant to the determination were ignored. These considerations, of course, generally enter into the determination whether an agency decision is arbitrary and capricious. *See RAMCOR,* 185 F.3d at 1289. In this regard, the court believes an agency's "best interest" finding under section 3553 is no less amenable to review than a "best value" determination, a finding commonly reviewed by this court in bid protest cases, albeit under a deferential standard. *See, e.g., Gulf Group, Inc. v. Unit-*

4. *See, e.g., Found. Health Fed. Servs. v. United States,* 1993 WL 738426, at *4 (D.D.C. Sept. 23, 1993); *Topgallant Group, Inc. v. United States,* 704 F.Supp. 265, 265–66 (D.D.C.1988).

5. *See, e.g., Blue Cross Blue Shield of Texas v. Office of Civilian Health and Med. Program of the Uniformed Servs.,* 889 F.Supp. 955, 957 (N.D.Tex.1995); *Burnside–Ott Aviation, Training Ctr., Inc. v. Dep't of Navy,* 1988 WL 179796, at *2–3 (D.D.C.1988); *Samson Tug & Barge Co. v. United States,* 695 F.Supp. 25, 27 (D.D.C.1988);

*Universal Shipping Co. v. United States,* 652 F.Supp. 668, 672–74 (D.D.C.1987).

6. *Cf. Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (CIA Director's decision to terminate employee under National Security Act of 1947 not subject to review where statute authorized Director, "in his discretion," to terminate employee "whenever he shall deem such termination necessary or advisable in the interests of the United States").

*ed States,* 56 Fed.Cl. 391, 396 (2003); *see also TRW, Inc. v. Unisys Corp.,* 98 F.3d 1325, 1327 (Fed.Cir.1996).[7] To say that this court must defer to agency discretion, however, is not to say that a particular finding is totally committed to that discretion, so as to make it unreviewable.

Defendants' assertion that the "best interest" finding is nonreviewable has a particularly hollow ring in the context of this particular statute. First, defendants provide no explanation as to why a "best interest" determination is not reviewable, while a determination that performance is required by "urgent and compelling" circumstances is. Logic suggests that, if anything, the latter determination, which brings with it much more serious overtones, ought to be owed more deference than the first. Indeed, the fact that both findings must be made in writing suggests that Congress intended further review. *See Burnside–Ott,* 1988 WL 179796, at *3. Second, a holding that the "best interest" finding is not reviewable would be tantamount to giving agencies a license to override the automatic stay at will. Such a conclusion would not only render the "urgent and compelling" prong of the statute largely superfluous, but would makes no sense in the context of a statute that was passed by Congress to strengthen the stay. The court simply cannot subscribe to the notion that the same Congress that, as repletely indicated in the legislative history of CICA, sought to bolster the GAO stay and prevent agencies from undercutting the protest review process would then arm agencies with an override option that could easily defeat those purposes—invocable essentially at will and with no judicial review. *See*

*Universal Shipping,* 652 F.Supp. at 673 ("To establish protest procedures and to make a stay of a protested contract automatic in all but extraordinary circumstances is to display a suspicion of agency fairness altogether at odds with foreclosure of judicial review.").[8]

 Having concluded that the override decision made by TRICARE is subject to review under the section 706 standard, it remains, under this factor, to determine whether plaintiff is likely to succeed on the merits in proving that the override decision here was arbitrary and capricious.

That decision was explained in a memorandum signed by the Director of Acquisition, Management and Support for TRICARE on August 16, 2003. In that memorandum, the Director summarized the basis for his decision as follows:

> In this case, I authorize contract performance notwithstanding the protests to GAO based on two separate and independent findings: (1) that continued performance by WPS is in the best interests of the United States and (2) that continued performance by WPS is justified by urgent and compelling circumstances that significantly affect the interests of the United States, which will not permit waiting for the GAO decisions. In arriving at my decision, I have considered the impact of continued suspension of contract performance in three areas. These are 1) the impact of the stay on the Department of Defense's strategic goal of transformation of the Military Health System (MHS), 2) the impact of delaying enhanced benefits/services to TRICARE beneficiaries

7. The FAR defines "best value" as "the expected outcome of an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement." 48 C.F.R. § 2.101 (2001).

8. Consistent with this view, the Ninth Circuit has observed:
 > The stay provisions were designed to preserve the status quo until the Comptroller General issued his recommendation, in order to ensure that the recommendation would be considered. Under prior practice, procuring agencies had tended to exploit loopholes in earlier stay regulations; they would rush into contract awards and get performance underway so that, by the

time the Comptroller General's recommendation came out, it would be too late and too costly to change contract awards, if such was the recommendation.
*Lear Siegler, Inc., Energy Prods. Div. v. Lehman,* 842 F.2d 1102, 1105 (9th Cir.1988), *mod. on other grounds,* 893 F.2d 205 (9th Cir.1989); *see also Ameron, Inc. v. U.S. Army Corps,* 787 F.2d 875, 879 (3d Cir.1986); Alex D. Tomaszczuk & John E. Jensen, "The Adjudicatory Arm of Congress—The GAO's Sixty–Year Role in Deciding Government Contract Bid Protests Comes Under Renewed Attack by the Department of Justice," 29 Harv. J. on Legis. 399, 407 (1992).

with dual eligibility under Medicare, and 3) the costs to the United States of continued suspension of contract performance.

In evaluating these factors, the Director assumed that awaiting the GAO's decision would result in a four-month nationwide delay—that is, that each of the contract deadlines would, notwithstanding the agency's best efforts, slip by four months if the stay were observed. A memorandum estimating the cost impact of this delay explained this assumption as meaning that "all aspects of the TDEFIC contract schedule would slip four months (*i.e.*, the phased startup would slip four months, and all of the option period dates would slip four months)." "In other words," this memorandum stated, "we assumed the terms of the contract would not change, except that all dates in the contract would slip four months."

As an initial matter, there is nothing that defendants have pointed to in the massive Administrative Record that supports, to any real degree, the Director's critical assumption that once delayed, there is no way for the agency or the winning contractor to shorten the transition periods and cause the new system to come on line before the old system lapsed. At least at this point in the proceedings, it appears, rather, that the Director conveniently assumed this point, despite the fact that the record contains a detailed risk plan, prepared in December of 2002, which indicates that the agency was planning for dozens of contingencies, among them that a "protest" would result in "transitions . . . not start[ing] timely." This assumption is particularly questionable in that it presumes, without any apparent supporting documentation, not only that the transition of the first sched-

uled region, Region 11, would be delayed, but that all the subsequent transitions, to occur through the summer and fall of 2004, would also be similarly delayed. This presumption, indeed, is directly controverted by a declaration of the Director filed with the court after oral argument, which candidly reveals that the transition schedule for these contracts is being compacted.[9] Without anything in the record to support this, the assumption that the agency in question would, over the course of eight months to a year, be unable to recapture some, if not all, of any delay associated with the GAO protest seems, at least at this juncture, so implausible as not to be the product of rational decisionmaking.[10]

The nakedness of this assumption, in turn, undercuts other critical findings made by the Director. For example, in asserting that awaiting the GAO decision would be prohibitively costly, the Director stated that there would be net savings of $5.27 million per month under the new contract. "Over the course of four months," he asserted, "the savings would be approximately $21.1 million." But, this calculation again assumes a four-month across-the-board delay of the full system, including regions not due to become operational until October 2004. Plaintiff points out that if, in fact, only Region 11 were delayed by the protest, the cost impact would be much less because that region, as defendant admits, involves only 2 percent of the claims in the entire system. Accordingly, even assuming the Director correctly estimated the monthly savings associated with the entire system—and, indeed, there is indication in the record that estimate is inflated—it remains that only 2 percent of those

9. This declaration, dated September 9, 2003, indicates that while the original date for the start of health care delivery in Region 11 has shifted by two months, from April 1, 2004, to June 1, 2004, the delay for Regions 2 and 5 is now estimated at one month (from June 1, 2004, to July 1, 2004), while no delays are anticipated for any of the other regions. This revised schedule certainly suggests that the transition sequencing of these contracts is not as inflexible as defendants previously contended.

10. Indeed, various other parts of the record appear to contradict claims that the TDEFIC and T–NEX contracts were coordinately in the fashion that defendants claims. For example, while

defendants suggest that the TDEFIC contract must be in place before the T–NEX contracts come on line, the record indicates that originally it was anticipated that the T–NEX would be awarded months before the TDEFIC contract—indeed, there is indication that the TDEFIC contract and the T–NEX contract for Region 11 were to transition at the same time. Similarly, while defendants claim that TDEFIC contractor has the responsibility of testing the new Defense Eligibility Enrollment System (DEERS) before the T–NEX contractors use that system, the record suggests that the TDEFIC and T–NEX contractors are to share that responsibility.

savings, or something on the order of $100,000 per month, would be lost initially on account of delaying the transition of Region 11. Moreover, the Director did not diminish the cost savings associated with his override decision by an amount corresponding to the risk that the protest would be sustained and the agency would be forced to reimburse WPSI for reasonable costs incurred during what would have been the stay period. The Director made no effort to quantify these costs, assuming instead either that the GAO protest would be denied, or that if sustained, WPSI would continue to perform. In the court's view, the Director thus appears all but to have ignored a variable that should have been an important aspect of his cost evaluation calculus.[11]

In his rationale, the Director also asserts that there is no easy way to extend the existing contracts to cover any delay that might be occasioned by the GAO protest, potentially leaving the beneficiaries without services. In this regard, he states that many of the current contracts, including the Region 11 contract, "will expire and cannot be extended under the existing terms for a sufficient period of time." He also suggests that while existing contractors might entertain negotiations for an extension under some sole source contracting authority, such negotiations would be "protracted [and] expensive for the government." These assertions, however, appear to be belied by the record. Indeed, shortly after issuing the override

decision, the agency announced that it would extend the contracts for at least some of the regions by two months. Moreover, it appears that the contracts in question contain, by reference, FAR Clause 52.217–8, which explicitly authorizes, within the limits and at the rates specified in the original contract, extensions of up to six months to deal with delays occasioned by bid protests.[12] The existence of these clauses not only appears to contradict the claim that the contracts in question cannot be extended, but also appears to belie the assertion that any such extensions would result in protracted and expensive negotiations. Thus, at this point, the court is left with the impression that any claim that the result of the GAO stay would be to leave TRICARE beneficiaries without needed services is "completely without foundation." *Samson Tug & Barge*, 695 F.Supp. at 27 (rendering this finding in rejecting an analogous claim that contracts could not be extended).

What remains of the Director's rationale for his override decision is his claim that the new contracts will provide better and more efficient services to TRICARE beneficiaries. Plaintiff does not contest this finding. Nonetheless, without more, the court does not believe that the mere fact that the new contracts would be better than the old is enough to support the override decision under either prong of section 3553. Certainly, given the possibility of either extending the existing contracts or shortening the period for the

---

**11.** There is clear indication that Congress intended such costs to be considered by agency officials in making a "best interest" determination. Thus, the Conference report that accompanied the enactment of CICA stated:

> Before notifying the Comptroller General that continued performance of a disputed contract is in the government's best interest, however, the head of the procuring activity should consider potential costs to the government from carrying out relief measures as may be recommended by the Comptroller General if the protest is subsequently sustained. This is to insure that if the Comptroller General sustains a protest, such forms of relief as termination, recompetition, or re-award of the contract will be fully considered for recommendation. Agencies in the past have resisted such recommendations on the grounds that the government's best interest would not be served by relief measures of this sort because of the added expense involved. This provision is de-

signed to preclude that argument in the future, and thus to avoid prejudicing those relief measures in the Comptroller General's review.

H.R. Conf. Rep. No. 98–861 at 1436, U.S.Code Cong. & Admin.News 1984, pp. 697, 1080–81.

**12.** Regarding this clause, FAR § 37.111, entitled "Extension of Services," provides: "[a]ward of contracts for recurring and continuing service requirements are often delayed due to circumstances beyond the control of contracting offices. Examples of circumstances causing such delays are bid protests and alleged mistakes in bid. In order to avoid negotiation of short extensions to existing contracts, the contracting officer may include an option clause (see 17.208(f)) in solicitations and contracts which will enable the Government to require conditional performance of any services within the limits and at the rates specified in the contract. . . ."

transition into the new contracts, the desire to receive sooner, rather than later, such contract benefits does not constitute "urgent and compelling circumstances that significantly affect interests of the United States [and that] will not permit waiting for the decision of the Comptroller General concerning the protest." Nor, without more, does the court believe that this sort of benefit is what Congress had in mind in allowing an override in the "best interests of the United States." Indeed, were the fact that a new contract is better than the old sufficient for this purpose, little would be left of Congress' efforts in CICA to strengthen the stay provisions and, with that, promote the integrity of the GAO review process. In this regard, the court notes that the statute does not allow the agency to override the stay when it is in the bests interests of that agency or the agency's contracting officials. Rather, the best interests of the "United States" must be involved and those interests necessarily include weighing the benefits Congress obviously felt were furthered by bolstering the bid protest process and, in turn, promoting competition in contracting.

In sum, the court concludes that plaintiff has demonstrated a likelihood of success on the merits.

### B. Balance of Hardships

Under this factor, the court must consider whether the balance of hardships leans in the plaintiff's favor. This requires a consideration of the harm to the government and to the intervening defendant. On this count, the government essentially reiterates the grounds it asserted in support of the override decision, essentially arguing that reinstituting the stay will delay implementation of the new contract. However, this assertion is no more compelling under this factor than above—indeed, this court has observed that "only in an exceptional case would [such delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests." *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388, 399 (1999). This is not such an "exceptional case," particularly as it appears that some of the problems encountered here are, at least in part, of defendant's own making, resulting from its (apparent) failure to factor into its transition schedule any time for the bid protests that its own risk analysis seemingly identified as probable. Moreover, defendants have not cited anything in the record that supports their claim that reinstituting the stay will cause TRICARE beneficiaries to lose services; indeed, as discussed above, the record appears to be to the contrary. In these circumstances, the balance of hardships tilts in the plaintiff's favor. *See Dairy Maid Dairy, Inc. v. United States,* 837 F.Supp. 1370, 1381–82 (E.D.Va.1993) (rejecting, as unfounded, a claim that the supply of product would be interrupted and morale will be adversely affected).

### C. Public Interest

Plaintiff also contends that the public interest will be served by granting the requested preliminary injunctive relief. Clearly, the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid. *See Cincom Sys., Inc. v. United States,* 37 Fed. Cl. 266, 269 (1997); *Magellan Corp. v. United States,* 27 Fed.Cl. 446, 448 (1993). In the instant case, the public's interest likewise lies in preserving the integrity of the competitive process—such, indeed, clearly was Congress' view in providing that, except in circumstances not yet demonstrated here, the automatic stay should prevail. In so holding, the court is mindful of the benefits that the new contracts might offer to TRICARE beneficiaries. But, those same beneficiaries, as well as the public at large, also have a long-term interest in ensuring that the new contract represents the best overall value to the government. Given the fact that there is no real indication that reinstituting the stay will impair services to a significant extent, the court believes that these long-term interests are paramount here and are best served by issuing the proposed injunction. *See Metcalf Constr. Co. v. United States,* 53 Fed.Cl. 617, 645 (2002); *DTH Management Group v. Kelso,* 844 F.Supp. 251, 255 (E.D.N.C.1993).

## D. Irreparable Injury

When assessing irreparable injury, "[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction." *Magellan Corp.*, 27 Fed.Cl. at 447. Plaintiff complains that this court's failure to issue a preliminary injunction will result in a competitive disadvantage. Specifically, *via* affidavits, it asserts that the advantages associated with its incumbency—PGBA is currently responsible for processing approximately 82% of the dual eligible claims under TRICARE—will evaporate as WPSI transitions into the new contract. It also asserts that *via* that same transition, WPSI will be competitively advantaged. This court has acknowledged that a lost opportunity to compete may constitute an irreparable harm, *Overstreet Elec. Co.*, 47 Fed.Cl. at 744; *Seattle Sec. Servs., Inc. v. United States*, 45 Fed.Cl. 560, 571 (2000), and, in the court's view, the injury claimed by plaintiff is similar. While defendants discount that concern, asserting that Congress, in 31 U.S.C. § 3554, provided that GAO, in constructing its recommended relief, should, in some cases, disregard certain costs incurred by a contract performer during what would have been the stay period, the court does not believe that statute fully addresses the injury plaintiff claims. Indeed, despite section 3554, Congress enacted the automatic stay on the premise that the failure of an agency to stay performance could result in a competitive disadvantage that might not be remedied, causing a contractor to lose an important business opportunity. *See, e.g., Lear Siegler, Inc.*, 842 F.2d at 1105; *DTH Management Group*, 844 F.Supp. at 254–55. One looking for proof that the risk of such a disadvantage here is real need only look to the Director's override memorandum, which indicates that the agency anticipates continuing the contract with WPSI even if the GAO protest is sustained. Accordingly, plaintiff has adequately demonstrated that it will suffer irreparable harm if preliminary injunctive relief is not granted.[13]

## III. CONCLUSION

The court finds that the prerequisites for issuing a preliminary injunction have been satisfied here. In consideration of the above, **IT IS ORDERED**:

1. Plaintiff's motion for preliminary injunction should be, and is hereby, **GRANTED**.

2. Pending further order of the court, defendant, acting by and through the Department of Defense, as well as Wisconsin Physicians Service Insurance Corporation, are hereby **ENJOINED** from performing on contract MDA906–030C–0015, awarded to Wisconsin Physicians Service Insurance Corporation on July 25, 2003, based on solicitation MDA906–02–R–0007. Said parties also must suspend any related activities that may result in additional obligations being incurred by the United States under the contract.

3. Pursuant to RCFC 65(a), plaintiff shall give security in the amount of $100,000.00 for the payment of such costs and damages as may be incurred or suffered in the event that future proceedings prove that this injunction was issued wrongfully. Plaintiff shall file proof of security with the Clerk of Court. The Clerk shall hold the bond until this case is closed.

4. The court is prepared to move promptly to a determination of the ultimate merits in this matter. Toward that end, on September 17, 2003, the parties shall file with the court a joint status report proposing a schedule for final resolution of this matter.[14]

5. This order shall be published as issued after September 28, 2003, unless the parties identify, with particularity, protected and/or

---

**13.** Even if this were not the case, the court would, nonetheless, grant the requested preliminary injunction based on its weighing of the other three injunctive factors. *FMC Corp.*, 3 F.3d at 427.

**14.** Should the GAO, prior to a final decision herein, resolve the pending protest, the court will remove the injunction herein, which is designed only essentially to require the Department of Defense to comply with the stay provisions of CICA. In the court's view, however, this result is unlikely, as the court would anticipate resolving this matter before any agency decision is reached by the GAO.

privileged materials subject to redaction prior to said date.

**IT IS SO ORDERED.**