**SPHERIX, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**ReserveAmerica Holdings, Inc., Defendant–Intervenor.**

No. 04–1488C.

United States Court of Federal Claims.

Oct. 18, 2004.

Eric J. Marcotte, Washington, DC, for plaintiff.

Kyle E. Chadwick, Washington, DC, with whom was Assistant Attorney General Peter D. Keisler, for defendant. Daniel N. Hylton, United States Department of Agriculture, of counsel.

Robert S. Metzger, Washington, DC, for defendant-intervenor. Michael K. Murphy, Gibson, Dunn & Crutcher, LLP, of counsel.

### *OPINION*

CHRISTINE O.C. MILLER, Judge.

This *post-award bid protest* is before the court after argument on plaintiff's motion to

enjoin performance of a government contract for a six-week period pending a decision on its protest before the Government Accountability Office (the "GAO"). Specifically, plaintiff seeks to enjoin the Government from continuing to override the automatic statutory stay of proceedings issued pursuant to the Competition in Contracting Act, 31 U.S.C. §§ 3553(c)(1), 3553(d)(3)(C) (2000) (the "CICA"), upon plaintiff's timely bid protest.

## FACTS

### 1. General background

This motion for injunctive relief implicates a history of contractual dealings between Spherix, Inc. ("plaintiff"), and the Government. The recitation of facts is drawn from plaintiff's complaint and two recent related Court of Federal Claims reported decisions involving the same parties and the same factual background, *Spherix, Inc. v. United States*, 58 Fed.Cl. 351 (2003) ("*Spherix II*") (addressing the court's jurisdiction of plaintiff's protest of sole-source award), and *Spherix, Inc. v. United States*, 58 Fed.Cl. 514 (2003) ("*Spherix III*") (ruling on plaintiff's motion for a preliminary injunction to prevent sole-source award). A third, earlier, bid protest has no record of judicial action. *See Spherix, Inc. v. United States*, No. 03–1170C (Fed.Cl., filed May 9, 2003) (voluntary dismissal) ("*Spherix I*").

Currently, two reservation systems exist for federal recreation facilities: the National Recreation Reservation Service system (the "NRRS") and the National Park Service reservation system (the "NPRS"). The NRRS was created in 1995 when the National Forest Service (the "Forest Service") of the United States Department of Agriculture (the "USDA"), the United States Department of the Interior (the "DOI"), and the United States Army Corps of Engineers (the "ACE") attempted to establish a single reservation system for the nation's federal recreation facilities. *Spherix II*, 58 Fed.Cl. at 353. Along the way to the realization of a global NRRS, however, the National Park Service (the "NPS"), an agency of the DOI, determined that it possessed "unique needs" for servicing "historic property such as the Washington Monument and Independence

Hall," *id.*, and decided to maintain its own reservation system in the form of the NPRS.

Plaintiff, a small business that as part of its services provides reservation services for federal– and state-owned camping and touring properties, has been awarded contracts for the NPRS since 1998, while defendant-intervenor ReserveAmerica Holdings, Inc. ("intervenor"), which also contracts for the same services within the Forest Service and DOI, has been awarded contracts under the earlier NRRS. Compl. filed Sept. 23, 2004, ¶ 6. The NRRS "provides reservation services for more than 1900 USDA and ACE campgrounds, cabins, and other facilities[,]" while the NPRS covers "reservation services for at least 30 NPS parks and tour ticketing at five NPS facilities." *Spherix II*, 58 Fed. Cl. at 353.

The Declaration of Richard C. Levin, Sept. 22, 2004, President of Spherix, Inc., submitted with plaintiff's moving papers, speaks to the history of this dispute and plaintiff's performance of its NPRS contract. Specifically, Mr. Levin attests that plaintiff's performance on the NPRS contract was rated "outstanding." Levin Decl., Sept. 22, 2004, ¶ 3. He details the contentiousness that has characterized this effort to create a single "one-stop" unified service, including the Forest Service's attempt to make a sole-source award to intervenor for sites that had been placed initially under an NPS solicitation in late 2002. Plaintiff was confident that it would receive the contract award; intervenor did not submit a proposal for this contract. Before the contract was awarded, however, the Office of Management and Budget (the "OMB") cancelled the solicitation, stating that it recognized a "need to consolidate NPS facilities into the NRRS as part of the President's E–Government Recreation One–Stop Initiative." *Spherix II*, 58 Fed.Cl. at 353. Plaintiff asserts that the OMB required the NPS to place its reservation system under the supervision of intervenor's NRRS, in effect giving intervenor a sole-source award for which it did not compete.

Following this OMB decision, NPS sites were added to intervenor's NRRS. *Spherix II*, 58 Fed.Cl. at 353. Plaintiff's protest to

the GAO was dismissed, after which plaintiff filed suit in the Court of Federal Claims to enjoin the consolidation of the NPS sites with the NRRS. The case was voluntarily dismissed pursuant to RCFC 41(a)(1)(I), *see Spherix I*, No. 03–1170C, when it became apparent that plaintiff's current NPS sites were not going to be "consolidated with the NRRS, and that a new solicitation would be offered in the spring of 2004 for the NRRS," *Spherix II*, 58 Fed.Cl. at 353, which would afford both plaintiff and intervenor the opportunity to compete for the award. This understanding was supported by a status report submitted by defendant on June 16, 2003, in *Spherix I*, representing that no intention had been manifested to consolidate plaintiff's currently performed services into the contract held by intervenor. Def.'s Status Report filed June 16, 2003, ¶ 1.

Despite this planned solicitation, the Forest Service awarded seventeen NPS sites to intervenor. *Spherix II*, 58 Fed.Cl. at 353. These sites had not been part of either the NPRS or the NRRS, so intervenor's contract required modification-beyond the scope of the original contract, according to plaintiff-in order to add the new sites. Plaintiff filed an agency-level protest with the Forest Service and the Park Service on June 26, 2003, complaining that the addition of such facilities was outside intervenor's contract, violated the CICA, and gave intervenor an unfair competitive advantage for the 2004 proposed solicitation. *Id.*

On August 7, 2003, in order to effect these steps toward consolidation of all reservation sites, the Secretary of Agriculture invoked 41 U.S.C. § 253(c)(7) (2000), which allows "an executive agency [to] use procedures other than competitive procedures only when... (7) the head of the executive agency (A) determines that it is necessary in the public interest to use procedures other than competitive procedures in the particular procurement concerned" and properly notifies Congress. 41 U.S.C. § 253(c)(7); *see Spherix III*, 58 Fed.Cl. at 518. The Secretary found that it was in the public interest to award the contract to intervenor non-competitively. When, on August 12, 2003, the Forest Service published a notice of its intent to award

a sole-source contract modification to intervenor for additional facilities, plaintiff timely filed a response offering to compete for the services. The Forest Service did not respond to this offer. *See* Levin Decl. ¶ 18. The Forest Service's sole-source award eventually was upheld in *Spherix III* with the court's finding that the Secretary of Agriculture properly executed her authority under 41 U.S.C. § 253(c)(7), *Spherix III*, 58 Fed. Cl. at 518.

### 2. *The current solicitation*

On March 25, 2004, the Forest Service issued Solicitation No. WO–04–06VM for a consolidated reservation system, the aforementioned NRRS. The Forest Service intended to award this contract on July 19, 2004. As part of its proposal, an offeror was required to present a number of specific system functions. These functions included:

> An internet-based reservation system that would allow for the real-time processing of reservation requests. The ability to process reservations and sales at individual field sites. The provision of a full-service contact center for the sale of reservations and other services, including facilities, personnel, workstations, computers, network connectivity, etc. The provision of management plans encompassing information, inventory, and financial management, and marketing and communications.

Compl. ¶ 13. Plaintiff alleges that it submitted a "fully compliant proposal"-and, in fact, the proposal with "the lowest evaluated price"on June 30, 2004. *Id.* ¶¶ 12, 14. Not only did plaintiff's bid offer at least $32 million in savings, Levin Decl. ¶ 25, but Mr. Levin states that his company is "better positioned" to meet the requirements of this most recent solicitation than is intervenor, *id.* ¶ 23. Plaintiff's experience with particular requirements of the solicitation-specifically, a "real-time system"-distinguish it from intervenor, which, according to Mr. Levin, has no experience with such systems. *Id.* Mr. Levin asserts that the Forest Service was going to award plaintiff the follow-on contract before the OMB cancelled the solicitation and that intervenor's performance has been lacking. *Id.* ¶ 24.

The Forest Service awarded the contract to intervenor on August 9, 2004. Plaintiff requested and received a debriefing, which was held on August 19, 2004. Plaintiff then timely filed a protest with the GAO on August 23, 2004. By statute the GAO must issue a determination within 100 days of the date of this filing. 31 U.S.C. § 3554(A)(1). Because plaintiff's protest was timely, the Forest Service, also by statute, was required to stay performance of the contract until the GAO resolved plaintiff's protest. *See* 31 U.S.C. § 3553(c)(1). In a September 15, 2004 Determination and Findings memorandum ("D & F"), however, Dale N. Bosworth, Chief of the USDA Forest Service ("Mr. Bosworth" or "the Chief"),[1] issued an override of the automatic stay and authorized continued performance under the contract while plaintiff's protest is pending. *See* Determination and Findings To Override the Automatic Stay and Authorize Continued Performance of Contract No. 53–3187–4–6031 (Sept. 15, 2004).

As the D & F is a crucial element in determining whether the Forest Service acted properly in exercising its power to override the stay imposed by the CICA, a detailed summary of the document is in order. The D & F provides a thorough description of the current and planned reservation systems for federal lands and landmarks, and uses the critical, albeit minimally-taxing, language that it is in the "public interest" to have one reservation service and, hence, continue contract performance by intervenor while plaintiff's protest is ongoing. The Chief extensively quotes the Director of the OMB's memorandum concerning the President's E–Government initiative, which raises to a presidential priority the consolidation of recreation reservation services under one system. The D & F further describes the agreement between the USDA, the DOI, and the ACE that established the NRRS as the public's one-stop recreation reservation service for federal public parks.

The D & F recites that, in June 2003, in order expeditiously to advance the one-stop service, the Secretary of Agriculture had issued a written determination that a noncompetitive contract modification adding additional facilities to intervenor's NRRS contract was in the public interest. Mr. Bosworth notes that this determination was upheld by the United States Court of Federal Claims in *Spherix II*. On August 9, 2004, the Forest Service awarded intervenor Contract No. 53–3187–4–6031 for the one-stop NRRS. The D & F states that the initial contract, worth $128 million, has a "go live" date of December 13, 2004, and will run for three years and four months, with six optional "award terms" of one year each.

The D & F next details plaintiff's protest of this award to intervenor and the following steps taken, including a debriefing and automatic stay pending resolution of the protest. The Chief cites and quotes the CICA provisions allowing for an override of the stay and reiterates the critical time frame for achieving the "go live" date of December 13, 2004. Key to this "go live" date are four months of preparation work by the contractor, part of which includes joint effort between the contractor and agency. The Chief further elaborates on the purpose of the NRRS and the issue of Certification and Accreditation ("C & A") that is addressed in the new contract.

The Chief's discussion relies heavily on the factor of timeliness: He emphasizes that the implementation of the new recreation reservation system is targeted to occur during the "off-peak" season of reservation activity, November through March, in order to limit the inconvenience to the public utilizing the new system and to prevent a rough transition of field staff from old to new systems, procedures, policies, and financial processes.

As such, the agency deems the time period between now and March 2005 crucial in order to produce an effective system for the public and recreation staff when reservation and recreation activities increase in March. With an override of the statutory stay, the Chief takes the position that intervenor and agency personnel can achieve phased-in implementa-

---

1. Mr. Bosworth is referred to as the "Acting Chief of the Forest Service of the United States Department of Agriculture" in the September 15, 2004 letter notifying the GAO of the stay, but signed the D & F as "Chief, USDA Forest Service."

tion of the new NRRS by March 1, 2005. Failure to continue work would result in a work stoppage, and intervenor likely would not be able to "go live" with a first phase basic NRRS website until mid-March 2005, with the complete reservation system not implemented until October 2005, due to the inability to put a new system in operation during the recreation season of March to October.

Mr. Bosworth takes the position that, with dual systems-the NPS and the NRRS-still in operation, the public would be unable to enjoy fully federal recreation activities because it could not discover the full range of services available. As additional impacts of a stay, he cites on-site management difficulties at popular attractions if the NRRS is not implemented for the next busy season. The printing of information by public and private tourism organizations would not be up-to-date if the stay were to remain in place. Further, the NPS would again be required to issue a sole-source contract to plaintiff allowing it to continue its services under the NPRS until the NRRS contract was in place.

In conclusion, the Chief reiterates the importance of implementing this one-stop service as a Presidential priority without a delay of one full season, points to the Secretary's decision to include NPS facilities in the current NRRS contract, emphasizes the benefit to the public, and notes the improvement that the consolidated system will bring to agency inventory management.

The D & F ultimately finds that the continued performance of the contract by intervenor is "in the best interests of the Government[,]" and that "[t]o stop the contractor's implementation at this time would cause considerable hardship and expense for the Agencies, and impact the provision of significant benefits to the public."

Plaintiff disputes the D & F's assertion that adhering to the stay would cause a delay in implementation of the NRRS, contending that the actual delay "would be measured in terms of only a few months." Levin Decl. ¶ 27. Plaintiff fortifies this argument by characterizing the delay incurred by maintaining the stay as minimal in comparison to the overall delay that the Government has caused throughout the process of implementing a consolidated NRRS. Plaintiff cites a failure to consolidate the systems beginning in 1996 and, later, an almost two-year delay between the OMB's directive to consolidate existing systems and the Forest Service's actual award of a contract to do so. Mr. Levin judges that a delay of a few months would not "materially impact" the system and offers the alternative that, if necessary, the current "NPS and NRRS systems could be linked via the internet portal contemplated by the Solicitation and, therefore, a one-stop internet site could be achieved very early in the program." *Id.* ¶ 27.

According to plaintiff, the Forest Services claims without support that the C & A process for the NRRS will be delayed and that the Forest Service will incur expenses in pursuing C & A for the legacy systems. Although plaintiff's point is understood to be that C & A is not required for the legacy systems, a closer look at the D & F reveals that C & A was not pursued for the legacy systems because of the impending implementation of the NRRS. However, if the NRRS is not implemented in a timely manner, C & A must occur for the legacy systems, even though those systems would only be in existence for a short period. To its credit, defendant, in its reply brief, admitted that the DOI and the USDA could waive or delay C & A for the current NPRS and NRRS. Def.'s Br. filed Oct. 8, 2004, at 15.

Finally, removal of the stay will prejudice plaintiff "by effectively denying it the opportunity to fairly compete for contract award" due to the competitive advantage intervenor would receive, even if plaintiff's protest is sustained. Compl. ¶ 21. Even if plaintiff succeeds on its protest before the GAO, Mr. Levin predicts that the Forest Service will claim that it is too late to re-solicit the contract and that allowing intervenor to continue contract performance will give it an unfair advantage if a later re-solicitation does take place. Levin Decl. ¶ 28. Finally, Mr. Levin asserts that a significant amount of plaintiff's revenues has come from its NPS contract and that a loss of this current contract would "significantly harm Spherix's business." *Id.*

Plaintiff thus charges that the Forest Service's decision to override the stay is arbitrary, capricious, an abuse of discretion and in violation of law and regulation. *See* 31 U.S.C. § 3553(d)(3)(C) and 48 C.F.R. §§ 1.704 and 33.104(c)(2) (2000).

Defendant counters with the statutory language of 31 U.S.C. § 3553(d)(3)(C)(i)(I), arguing that a D & F is not required in these circumstances (even though one was issued) and that an agency head need only act via a written finding showing that the contract is in the best interests of the United States. Defendant also emphasizes that the review of an agency's actions in this instance is conducted under an arbitrary and capricious standard and that the D & F need not manifest a clear and convincing justification. Defendant continues that the only relief to which plaintiff may be entitled is a declaration invalidating the Forest Service Chief's override and remanding the matter to the agency, arguing that an injunction is improper because plaintiff cannot establish that no override could ever be justified.

Despite its adverse position on the propriety of injunctive relief, defendant nevertheless addresses the criteria for issuing an injunction. It argues for upholding the rationality of the Chief's written finding that the March 2005 "go live" schedule is in the best interests of the United States; that the written finding rationally explains the reasons for promptness in the C & A process; and that the Chief, as an agency head, is entitled to deem this procurement a high priority.

After a hearing on plaintiff's motion for a preliminary injunction on September 27, 2004, the court consolidated the request for preliminary relief into one for permanent injunctive relief because of the imminence of the GAO deadline. RCFC 65(a)(2). Disposition of plaintiff's claims for a permanent injunction will resolve the matter before the court because a "bid protest . . . is an injunctive action to prevent a competitor from securing the fruits of a government contract. The preliminary relief is the same as the ultimate relief." *Hawaiian Dredging Constr. Co. v. United States,* 59 Fed.Cl. 305, 317 (2004). Per the parties' request, an expedited briefing and hearing schedule was ordered. Defendant filed its opposition to plaintiff's motion on October 8, 2004, and plaintiff submitted its reply on October 13, 2004. Oral argument was held on October 14, 2004. The court committed to issue a decision on this date.

## DISCUSSION

### 1. *Jurisdiction and standard of review*

Plaintiff seeks to enjoin the Forest Service from overriding the statutory stay imposed by the CICA, thereby preventing further performance of the contract pending the GAO's decision on plaintiff's protest. Accordingly, the issue before the court is whether plaintiff has established that the override should be overturned and that it is entitled to an injunction during the interim before the GAO issues its decision. Irrelevant and confusing to the issue for resolution is defendant's digression that plaintiff's action should be construed as seeking declaratory, as opposed to injunctive, relief. The problem is not semantic, as the Government uses almost every bid protest case as a platform for the argument that a serious error in the procurement process shall result in a remand to give the agency another bite at issuing a sustainable procurement decision,[2] rather than enjoining the procurement process to afford the protestor the fruits of prevailing on the protest. Remand is not the proper relief, if plaintiff is deserving of any

---

**2.** Declaratory relief with remand has not been shown to be the proper relief in circumstances such as these. *See PGBA, LLC v. United States,* 57 Fed.Cl. 655 (2003) (granting plaintiff's motion for preliminary injunction and enjoining contracting agency's override of stay); *see also Sierra Military Health Servs. v. United States,* 58 Fed.Cl. 573, 582 (2003) (denying plaintiff's motion for preliminary injunction on agency's override of stay without consideration of declaratory

relief). *Cf. Chapman Law Firm Co. v. United States,* 62 Fed.Cl. 464, 469, 2004 WL 2315742, at *6 (2004) (declaring agency's override of stay invalid and denying plaintiff's motion for injunctive relief as moot); *Altos Fed. Group v. United States,* 60 Fed.Cl. 832 (2004) (holding agency's override decision invalid and of no effect and ruling plaintiff's request for temporary restraining order moot).

relief. Instead, as intervenor properly notes in its brief, this is an action for injunctive relief.

Pursuant to the CICA, "a contract may not be awarded in any procurement after the Federal agency has received notice of a protest with respect to such procurement from the Comptroller General and while the protest is pending." 31 U.S.C. § 3553(c)(1). Nevertheless, the CICA allows the head of the procuring agency to continue with performance of an awarded contract, despite the protest, if, in a "written finding," he finds that "(i) performance of the contract is in the best interests of the United States; or (ii) urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest." 31 U.S.C. § 3553(d)(3)(C).[3]

The United States Court of Federal Claims has jurisdiction over a bid protest initiated after contract award. 28 U.S.C. § 1491(b)(1) (2000 & Supp.2004). Section 1491(b)(2) vests the court with authority to grant "any relief [in an action under section 1491(b)(1)] that [it] considers proper, including declaratory and injunctive relief." 28 U.S.C. § 1491(b)(2). The United States Court of Federal Claims also has jurisdiction to hear an objection to the override of a statutory stay pursuant to the CICA. *See RAMCOR Servs. Group v. United States,* 185 F.3d 1286, 1289 (Fed.Cir.1999). In *RAMCOR* the Federal Circuit addressed whether a plaintiff's objection to a CICA override under section 3553(c)(2) provided the Court of Federal Claims a jurisdictional basis under section 1491(b)(1). Citing the Tucker Act's language of an "alleged violation of statute or regulation *in connection with a procurement or proposed procurement*[,]" 28 U.S.C. § 1491(b)(1) (emphasis added), the Federal Circuit concluded that the broad language "in connection with" supported jurisdiction because "an agency's actions under a statute [that] so clearly affect the award and per-

formance of a contract [clearly have] a 'connection with a procurement.'" *RAMCOR,* 185 F.3d at 1289 (quoting 28 U.S.C. § 1491(b)(1)).[4] The Court of Federal Claims addressed its jurisdiction over an agency override under the criteria set forth in section 3553 and determined that a "best interest" finding in support of an override decision is reviewable. *PGBA,* 57 Fed.Cl. at 659.

In bid protest actions under 28 U.S.C. § 1491(b)(1), the court applies the standards of review set forth in the Administrative Procedure Act (the "APA"). *See Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.2003). Specifically, 5 U.S.C. § 706(2)(A) provides the standard that the protestor must show the agency decision to be "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law." However, under its bid protest jurisdiction, the Court of Federal Claims merely is exercising jurisdiction using the APA standard of review; it is not reviewing agency action under the APA. *See Banknote Corp. of Am. v. United States,* 365 F.3d 1345, 1350–51 (Fed.Cir.2004).

The arbitrary and capricious standard contemplates that review will consist of determining whether (1) a rational basis for the decision is lacking or (2) a violation of an applicable regulation or a procedure occurred during the procurement procedure. *Banknote Corp.,* 365 F.3d at 1351; *see Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996). A challenge based on the first ground examines whether the agency " 'provided a coherent and reasonable explanation of its exercise of discretion' " and requires plaintiff to show that the award had no rational basis. *Id.* at 1351 (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1333 (Fed.Cir. 2001)). The "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.' " *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 456

---

3. For a discussion of the CICA's background and purpose, *see PGBA,* 57 Fed.Cl. at 657.

4. *RAMCOR*'s holding extends to both avenues permissible for override under 31 U.S.C. § 3553(d)(3)(C)-either that the override is in the

"best interests of the United States" or that "urgent and compelling circumstances" dictate the necessity of the override. *See Chapman Law Firm,* 62 Fed.Cl. at 466, 2004 WL 2315742, at *3; *Altos,* 60 Fed.Cl. at 833.

(D.C.Cir.1994) (quoting *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir. 1973)); *see also OMV Med., Inc. v. United States,* 219 F.3d 1337, 1343 (Fed.Cir.2000) (quoting *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1058 (Fed.Cir. 2000)) (stating that under the arbitrary and capricious standard, a reviewing court must "sustain the agency action in question if the action 'evinces rational reasoning and consideration of relevant factors[ ]' ").

The Supreme Court has identified four grounds that constitute arbitrary and capricious agency action:

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Under an arbitrary and capricious review, moreover, a court must adhere to a narrow standard and not "substitute its judgment for that of the agency." *Id.*

While the arbitrary and capricious standard of review is overarching, plaintiff identifies an interesting statutory predicament when it urges the court to apply a clear and convincing standard to the Forest Service's D & F. In essence, imposition of this standard would require plaintiff to show that the Forest Service acted arbitrarily and capriciously because it did not provide clear and convincing reasons for the stay. Plaintiff's rationale is legitimate, although in the end proves to be a moot point. Plaintiff contends that the "written finding" required under the CICA in 31 U.S.C. § 3553(d)(3)(C) is parallel to the justification for a sole-source award under 41 U.S.C. § 253(c)(7), which requires a written notification to Congress upon award of such sole-source contract. The latter statute is implemented by 48 C.F.R. § 6.302–7, which requires a "written determination" when an agency head "determines that it is not in the public interest" to have "[f]ull and open competition[.]" 48 C.F.R. § 6.302–7(a)(2). The written determination (called a Determination and Finding, 48 C.F.R. § 6.302–7(c)(4)) must be made in accordance with subpart 1.7. 48 C.F.R. § 1.704 requires that "[e]ach D & F shall set forth enough facts and circumstances to clearly and convincingly justify the specific determination made."

A similar regulation that mandates the form and content of the written finding did not issue with respect to the CICA, 31 U.S.C. § 3553(d)(3)(C). However, plaintiff argues, the CICA should have the same requirements for the override "written finding" as the sole-source requirements for "written notification." The D & F issued by the Forest Service, therefore is

> a special form of written approval by an authorized official that is required by statute or regulation as a prerequisite to taking certain contract actions. The determination is a conclusion or decision supported by the findings. The findings are statements of fact or rationale essential to support the determination and must cover each requirement of the statute or regulation.

48 C.F.R. § 1.701. In setting forth "enough facts and circumstances to clearly and convincingly justify the specific determination made," *id.,* a D & F must include, minimally, the following:

> (a) Identification of the agency and of the contracting activity and specific identifications of the document as a Determination and Findings.

> (b) Nature and/or description of the action being approved.

> (c) Citation of the appropriate statute and/or regulation upon which the D & F is based.

> (d) Findings that detail the particular circumstances, facts, or reasoning essential to support the determination. Necessary supporting documentation shall be obtained from appropriate requirements and technical personnel.

(e) A determination, based on the findings, that the proposed action is justified under the applicable statute or regulation.

(f) Expiration date of the D & F, if required (see 1.706(b)).

(g) The signature of the official authorized to sign the D & F (see 1.706) and the date signed.

*Id.* § 1.704(a)-(g).

Defendant remains firm in its stance that the CICA does not require a D & F because no sole-source award is at issue, arguing that trial court decisions overturning overrides have not held the D & F to this heightened standard of explication and justification. *See supra* note 2 (citing cases). Although the sole-source statute does not specify that a finding is required, the regulations require a D & F. Therefore, according to plaintiff's logic, because the override statute already requires a written finding, this statute itself contemplates a D & F. Plaintiff's argument has appeal as it supplies the criteria to judge the sufficiency of the D & F issued by the Chief. The court finds it unnecessary to resolve this issue, however, because under either a heightened or lower standard, the D & F represents a rational explanation for the action taken.

2.  *Injunctive relief*

■ The Federal Circuit has described injunctive relief as an "extraordinary remedy." *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993); *see CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1581 (Fed.Cir.1983). In order to obtain a permanent injunction, plaintiff must demonstrate by a preponderance of the evidence[5] that 1) it has achieved actual success on the merits; 2) it will suffer irreparable harm if injunctive relief is not granted; 3) the harm to plaintiff if an injunction is not granted outweighs the harm to the Government if an injunction is granted; and

4) the injunction serves the public interest. *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *FMC Corp.,* 3 F.3d at 427. No one of the four factors is determinative. *FMC Corp.,* 3 F.3d at 427. For clarity, "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co.,* 480 U.S. at 546 n. 12, 107 S.Ct. 1396 (citing *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 392, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)).

1)  *Success on the merits*

■ Congress charted an easy course for an agency override. Failing the ability to show that urgent and compelling circumstances justify the override, the agency head can elect to make the unremarkable determination that contract performance is in the best interests of the United States. Presumptively, performance of government contracts on schedule always serves the best interests of the United States.[6] In any event, one of the two justifications recognized by the CICA for allowing a stay is minimal; hence, plaintiff's ability to succeed on the merits-to demonstrate that the Chief of the Forest Service's written finding is arbitrary or capricious-faces an uphill battle. *See Saratoga Dev. Corp.,* 21 F.3d at 456; *OMV Med., Inc.,* 219 F.3d at 1343.

Plaintiff cannot succeed on the merits. Although the CICA requires a stay of contract performance while a protest is pending, it also allows an agency head to override that stay. Even adopting plaintiff's reasoning that a D & F is required to implement the CICA's "written finding" requirement, such that the D & F must be held to a clear and

---

5.  Despite suggestions in other opinions, *see, e.g., PGBA,* 57 Fed.Cl. at 657, injunctive relief will issue upon a showing of preponderance of the evidence, as opposed to a showing by clear and convincing evidence. There is no support in the law for applying a clear and convincing standard to a request for injunctive relief. *See Bannum, Inc. v. United States,* 60 Fed.Cl. 718, 723–24 (2004).

6.  Defendant makes the interesting point that the agency head can override a stay of a protest filed before contract award only upon a written finding that urgent and compelling circumstances are present. Thus, the post-award justification for override, made after contract award, must meet a less stringent test because the protection of competition is less crucial at that juncture.

convincing standard, plaintiff did not demonstrate that the Forest Service's D & F was anything but clear and convincing.

The D & F issued by the Chief was thorough and informative as to the reasons for overriding the stay. Defendant emphasizes that this particular program is a Presidential priority, not an ordinary governmental program, that has a long history and was beset with inter-agency rivalries. Although plaintiff questions the significance of any delay that an injunction might cause during the remaining six-week period before the GAO issues its decision, the Forest Service's assessment as to the effect of a further constraint on implementation was reasonable. The D & F equates missing the December 13, 2004 "go live" date to jeopardizing phased-in implementation on March 1, 2005. This four-month delay (from the date of the D & F) would mean that the new system could not be operational during the busy reservation season from March through October. In tandem is the issue of C & A, which defendant claims can take up to 100 days to complete fully. While defendant subsequently withdrew its position that C & A for existing systems could not be waived, see Def.'s Br. at 15, this contractual obligation could impact significantly on the Forest Service's time considerations.

The reasons discussed support a finding that the Forest Service, through the Chief's D & F, presented a rational basis for its decision to move forward with contract performance, despite plaintiff's protest. The determination that an override of the stay was in the best interests of the United States was rational, and, therefore, the decision was neither arbitrary nor capricious.

### 2) *Irreparable harm to plaintiff*

To merit injunctive relief, plaintiff must demonstrate that it will suffer irreparable harm if such relief is not granted. *FMC Corp.*, 3 F.3d at 427. Plaintiff alleges economic harm in that the loss of the NPRS and the NRRS contracts will "significantly harm" its business, including the necessity of dismissing many of its employees. Levin Decl. ¶ 28. However, economic loss without more does not rise to the level of irreparable inju-

ry. *See Zenith Radio Corp. v. United States*, 710 F.2d 806, 810 (Fed.Cir.1983). As in *Sierra Military Health Servs. v. United States*, 58 Fed.Cl. 573, 582 (2003), cited by intervenor at oral argument, "most of plaintiff's alleged harms result not from a lack of opportunity to compete for the contract, but from loss of the actual contract." Plaintiff lost the Forest Service's solicitation for the NRRS and timely has protested the contract award. As to the NPRS contract that it "loses" through consolidation, plaintiff has been aware of the effort to consolidate the recreation reservation systems since 1996. Levin Decl. ¶ 4. Plaintiff's NPRS contract was scheduled to expire December 31, 2002, and since that date was extended through September 2004 via sole-source emergency justification while the Forest Service awaited the consolidated system. *Id.* ¶ 18. In essence, plaintiff was aware of the upcoming consolidation and the fact that it must compete for the contract.

Similar to the plaintiffs in *PGBA* and *Sierra Military Health Services*, however, plaintiff cites a competitive disadvantage if an injunction does not issue because it will not be able to take over easily intervenor's contract if the GAO rules for plaintiff and plaintiff is subsequently awarded the contract. In general, plaintiff foresees that it will be in a worse position to compete for the award if intervenor moves forward with contract performance. Judge Futey foresaw precisely this juggernaut:

> The court understands that part of plaintiff's motivation for this protest is the concern that by consolidating additional recreation sites into the NRRS during the intervenor's contract term, the government is providing a competitive advantage to intervenor with respect to the anticipated 2004 solicitation. This advantage would appear even greater than plaintiff initially suspected, given the government's predetermination of the NRRS as its "one stop" reservation system, which intervenor now operates, and which may be extended by option until 2007.

*Spherix III*, 58 Fed.Cl. at 517–18 (footnote omitted). In fact, defendant agreed during argument that the momentum existed to bet-

ter position intervenor for award. The *PGBA* court "acknowledged that a lost opportunity to compete may constitute irreparable harm." *PGBA*, 57 Fed.Cl. at 664. In this case, however, the opportunity is diminishing, so intervenor forges ahead with performance.

Having any performance of the NRRS contract continue causes plaintiff some type of harm. In the particular circumstances of this protest, plaintiff suffers irreparable harm. However, plaintiff's success on this factor does not overcome the court's findings on the other three factors.

### 3) *Weighing of respective harms*

Under this factor a court balances the harm to each party to determine if the balance of hardships favors plaintiff. Intervenor agreed at argument that the controversy is truly between plaintiff and defendant. Hence, the weighing of the harms will be addressed without consideration of intervenor's interest, which obviously is to have the contract proceed.

The respective harms to the parties are programmatic issues. If an injunction does not issue, plaintiff claims that it will be placed in a less advantageous position for the award, assuming the GAO sustains plaintiff's underlying protest. On the other hand, if plaintiff prevails in its protest to the GAO and subsequently receives the award, the parties are dealing with a "virtual facility" that would not require any sort of physical occupation or changeover from intervenor to plaintiff. Hence, plaintiff's argument that it would have difficulty overcoming intervenor's current performance is reduced somewhat. The Government is prepared to sustain a termination for convenience in the fixed amount of $1 million should the agency adopt a GAO recommendation favorable to plaintiff, which minimizes the harm to the Government if the override is sustained.[7]

Should an injunction issue, however, the Forest Service will suffer what it has repre-sented as a year-long delay because the new recreation system cannot be put in place during the busy recreation season. Practically, an injunction would mean the loss of the reservation season to the Forest Service with regard to use of the new system. Plaintiff has not shown that the Forest Service's concern of losing the busy season was other than rationally based. Although plaintiff offered short-term solutions that would give access at one time to both currently existing sites, this is not the goal of the program.

### 4) *Public interest*

It is in the public interest for the government to conduct fair procurement procedures, and to give honest and fair consideration to all bids. *Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1152 (Fed.Cir. 1994) (citing *Heyer Prods. Co. v. United States*, 147 Ct.Cl. 256, 177 F.Supp. 251, 252 (1959)); *see Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 846 n. 9 (D.C.Cir.1982).

During argument defendant's counsel made the point that a pre-award override by an agency head, 31 U.S.C. § 3553(c)(2)(A), is held to a higher standard than an override that is instituted after contract performance has begun, 31 U.S.C. § 3553(d)(3)(C). Specifically, the "best interests" exception in section 3553(d)(3)(C) is not an acceptable reason for authorizing a stay under section 3553(c)(2)(A). This statutory language demonstrates Congress' disinclination to interrupt the performance of contracts; by providing agency heads with a lower standard for overriding a stay, Congress recognized the need for continuing performance of awarded contracts.[8]

The public interest was summarized by intervenor at argument: The risk exists that the system will not be up and running by the next busy season beginning in March 2005. The question, then, becomes whether six weeks-roughly the time from this decision until the GAO's decision on December 1,

---

7. Defendant represented that the termination liability would be $1 million.

8. A showing for an override under section 3553(d)(3)(C) is not *de minimis* because notifica-tion to Congress is required and encourages restraint, and the statutory presumption still is that the stay should remain in place and the override occur only if valid justification is shown.

2004–will cause such delay that an injunction should not enter. The court finds that enjoining the override would not be in the public interest.

## CONCLUSION

Accordingly, based on the foregoing,

1. Plaintiff's motion for a preliminary injunction and its request for a permanent injunction are denied.

2. The Clerk of the Court shall enter judgment for defendant and intervenor.

**IT IS SO ORDERED.**