**CHAPMAN LAW FIRM CO., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Michaelson, Connor & Boul, Inc., Defendant–Intervenor.**

**No. 05–750C.**

United States Court of Federal Claims.

Aug. 5, 2005.

James S. DelSordo, Washington, DC, for plaintiff.

David A. Harrington, U.S. Department of Justice, Washington, DC, with whom were Peter D. Keisler, Assistant Attorney General, and Director David M. Cohen, for defendant. R. Rene Dupuy, U.S. Department of Housing and Urban Development, Washington, DC, of counsel.

Margaret A. Dillenburg, Washington, DC, for defendant-intervenor. Alexander Brittin and Jonathan D. Shaffer, Vienna, VA, of counsel.

## OPINION DENYING PRELIMINARY INJUNCTION

FIRESTONE, Judge.

This post-award bid protest is before the court on the motion of Chapman Law Firm Co. ("Chapman" or "plaintiff") to preliminarily enjoin performance of a government contract pending a decision by the Government Accountability Office ("GAO") on the merits of its protest before that body. Specifically, the plaintiff asks the court to enjoin the Department of Housing and Urban Development ("HUD" or the "government") from continuing to override the automatic stay of performance normally issued after a timely

bid protest pursuant to the Competition in Contracting Act of 1984, 31 U.S.C. § 3553(c)(1), (d)(3)(c) (2000) ("CICA"). The plaintiff contends that HUD's decision to override the stay at issue was based on HUD's own failure to plan and manage the underlying procurement and, as such, is not rational. The government responds that HUD's override of the automatic stay was in the best interests of the United States and was therefore within the discretion of the agency to authorize. For the reasons that follow, the court agrees with the government and **DENIES** the plaintiff's motion.

## BACKGROUND

The following facts are not in dispute unless otherwise noted. On April 19, 2005, HUD awarded a contract to Greenleaf Construction Company ("Greenleaf") for Management and Marketing ("M & M") services in connection with properties owned by HUD in the region of the United States known as the "P2 region," which includes properties in Ohio and Michigan. The services to be provided by the awardee included the following: monitoring mortgagee compliance with HUD's property conveyance requirements; managing single family homes owned by, or in the custody of, HUD; marketing HUD's single family homes for sale; and overseeing both the sale of these HUD properties and all related closing activities. The award of the P2 contract to Greenleaf prompted a protest by the plaintiff before the GAO on May 2, 2005. After the filing of this protest, and based in part on comments received from the Small Business Administration ("SBA"), HUD elected to terminate the award of the contract awarded to Greenleaf and the plaintiff's protest was dismissed.

Greenleaf then protested the termination of its P2 contract in the United States Court of Federal Claims. That case is currently pending before Judge Bruggink, another Judge of this court. Judge Bruggink set a schedule for the parties to brief the issues in that case and ordered HUD not to make a final award of the contract until August 31, 2005. However, because Chapman was the only other contractor that bid on the P2 contract, it is anticipated that if Greenleaf

does not prevail in its bid protest, then Chapman will receive the award of the P2 contract, pending a determination that it is responsible to perform the contract.

The incumbent contractor for the P2 region is Michaelson, Connor and Boul, Inc. ("MCB"), which has been providing M & M services since 1999. When the award to Greenleaf was cancelled, HUD awarded a bridge contract to MCB for four months with two four-month option periods. The contract with MCB will ensure that HUD is provided M & M services until Judge Bruggink's decision in the underlying protest and the final award of the P2 contract.

Chapman protested the award of the MCB bridge contract before the GAO. Under procurement regulations, if a contract award is protested before the GAO, either the government is obligated to automatically stay the performance of the protested contract or it is required to make a written determination that *inter alia*, an override of the automatic stay is "in the best interests of the United States." 48 C.F.R. 33.104(c)(2) (2000). HUD neither stayed performance of the contract nor immediately issued a written determination that it was in the best interests of the United States to override the automatic stay. Rather, the government continued accepting performance of the bridge contract by MCB without a written finding.

The present action was filed on July 13, 2005. In its complaint and motion for a preliminary injunction, the plaintiff contended that the failure of HUD either to stay contract performance or to make a written determination that an override was in the best interests of the United States should be set aside as not in accordance with law. After the plaintiff filed its motion on July 13, 2005, HUD issued a written determination that the override of the automatic stay is in the "best interest[s] of the United States." In support of this determination, Frank Slezak, Director of Field Contracting Operations, Head of the Contracting Activity, made the following findings:

Failure to manage M & M properties, for even one day, could result in financial harm to the Department as a result of physical damage to its housing assets.

Vandalism and/or damage from elements could result in a reduction in the sales price of the property and a decreased return to the FHA mortgage insurance fund.... Absent a responsible M & M contractor monitoring the management, marketing and sales aspects these services, the Department will incur a loss of $127,000 per day or $3M per month. Additionally, 1,652 of the properties in P2 are currently under contract for sale. Without contract support to complete these sale transactions, contract purchasers risk losing their loan commitments, being left without homes to move into and may have a cause of action against the government for breach of contract. Finally, HUD acquires more than 600 new properties each month in P2. The impact on local communities would be devastating if HUD did not have a contractor to secure, clean and maintain these vacant properties.

Determination and Findings of the Head of the Contracting Activity to Override the Automatic Stay of Performance ("Determination and Findings") at 2.

Based on these findings, the Director determined that "it is in the best interest[s] of the United States to override the automatic stay of performance under the contract, so that the incumbent contractor may continue to supply M & M services for the benefit of the Government." Determination and Findings at 3.

In light of the fact that HUD had now made a best interests determination, at the initial status conference on the plaintiff's case the court granted the plaintiff leave to amend its motion and complaint to address the merits of HUD's best interests determination. The plaintiff filed its amended complaint and

motion on July 18, 2005, which the government and the intervenor, MCB, opposed in briefs submitted shortly thereafter.[1] Argument on the motion was heard on July 29, 2005.

## DISCUSSION

■ This court has jurisdiction under the Tucker Act to hear objections to an override of an automatic stay of performance pursuant to the CICA. 28 U.S.C. § 1491(b)(1) (2000); *RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1289 (Fed.Cir.1999). The only question before the court is whether the plaintiff is entitled to a preliminary injunction, preventing HUD from authorizing the performance of the bridge contract awarded to MCB pending the outcome of Chapman's protest before the GAO. In order to obtain a preliminary injunction, a plaintiff must:

> establish a right thereto in light of the following factors: 1) that the movant is likely to succeed on the merits at trial; 2) that it will suffer irreparable harm if preliminary relief is not granted; 3) that the balance of the hardships tips in the movant's favor; and 4) that a preliminary injunction will not be contrary to the public interest.

*FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed.Cir.1993); *Spherix, Inc. v. United States*, 62 Fed.Cl. 497, 505 (2004). "No one factor, taken individually, is necessarily dispositive.... [T]he weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC*, 3 F.3d at 427. Issuance of a preliminary injunction is within the discretion of the trial court. *PGBA, LLC v. United States*, 389 F.3d 1219, 1223 (Fed.Cir.2004); *FMC*, 3 F.3d at 427.

1. In response to the plaintiff's motion, the government has also submitted a declaration of Laurie Anne Maggiano, the Deputy Director of HUD, Office of Single Family Asset Management. In her declaration, Ms. Maggiano stated that:

> Based on current inventory, the Department will incur a loss in excess of $127,000 per day (or over $3 million per month) if M & M services are not available. More than 1,600 families and individuals have contracts pending to purchase HUD homes in the P2 contract area. Without an M & M contractor to complete the sale transactions, these purchasers

> will be unable to close the sales and may be homeless if leases or closing dates of their current residences cannot be extended.... [This] will unfairly disadvantage hundreds of people and expose the government to lawsuits for damages and/or specific performance.

Declaration of Maggiano at 5. Ms. Maggiano went on to declare that "[v]acant properties that are not maintained have a detrimental impact on neighbors and communities," including exposing them to "vandalism, gang infiltration, vagrancy, illegal dumping, health and safety issues and code violations." Declaration of Maggiano at 6.

### 1) Success on the Merits

The plaintiff contends that it is likely to succeed on the merits of its case before the GAO on the ground that HUD's decision to award a sole-source bridge contract to MCB was not legally justified and, therefore, continuing to accept performance of this contract is not in the best interests of the United States. The government contends that the legality of the bridge contract is not before the court and is irrelevant to the best interests determination. Instead, the government argues that the sole question is whether HUD's decision to override the automatic stay was justified.

This court reviews challenges to agency actions described in § 1491(b)(1) according to the standards set forth in the Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA"). 28 U.S.C. § 1491(b)(4). Under the APA, the reviewing court may only overturn an agency action if the court finds that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2000). *Cardinal Maintenance Service, Inc. v. United States,* 63 Fed.Cl. 98, 105 (2004). The Supreme Court has identified four grounds that constitute arbitrary and capricious agency action:

> Normally, an agency [action] would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Spherix,* 62 Fed.Cl. at 504.

█ Mr. Slezak, HUD's Director of Field Contracting Operations, determined that the override of the automatic stay was in the "best interest[s] of the United States." Determination and Findings at 3. In his written report, the Director stated that the following consequences would result from the absence of the M & M services now being performed

pursuant to the override: HUD will suffer financial harm as a result of physical damage to its housing assets; vandalism and/or damage from the elements could result in a reduction of sales prices of the properties and a decreased return to the mortgage insurance fund; HUD will incur a loss of $3 million per month without a responsible M & M contractor; and HUD may be exposed to legal liability for breaches of contract if expected property sales are not completed.

The findings and determination made by Director Slezak are further supported by the declaration of Ms. Maggiano, Deputy Director of HUD, Office of Single Family Asset Management. Ms. Maggiano declared that, in the absence of M & M services, HUD will incur a loss in excess of $3 million per month. She further declared that potential purchasers of HUD housing could become homeless as a result of the unavailability of low-income housing and that the government would be exposed to liability for breach of contract. Declaration of Maggiano at 5. Finally, she declared that the failure to maintain the properties would expose communities to "vandalism, gang infiltration, vagrancy, illegal dumping, health and safety issues and code violations." *Id.* at 6.

The plaintiff does not counter any of the findings relied upon by HUD either in Director Slezak's Determination and Findings or in Ms. Maggiano's declaration. Indeed, the plaintiff concedes that it is necessary for the government to receive uninterrupted grounds maintenance and security services. Rather, the plaintiff contends that an override is not in the best interests of the United States because HUD has flaunted its obligations under the FAR. In particular, the plaintiff agrees that HUD should have undertaken better planning when the Greenleaf contract was set aside and should have awarded the contract to the plaintiff instead. The government argues, and the court agrees, that whether HUD properly awarded the bridge contract in the first instance is not at issue before the court. The legality of the bridge contract goes to the merits of the case, which will be dealt with at the protest before the GAO. The plaintiff's contention that review of the best interests determina-

tion includes a review of the merits of the underlying dispute is not supported. This court is only reviewing HUD's determination that an override of the stay is in the best interests of the United States. Because HUD has presented detailed findings about the potential negative effects of staying performance of the P2 contract at this time, and in light of the plaintiff's lack of disagreement with these findings or the conclusions based on them, the court finds that the plaintiff is unlikely to succeed on the merits of its claim.

This result is similar to the result reached in other cases that addressed similar questions. In *Spherix*, the plaintiff moved the court to enjoin an agency override of an automatic stay. This court denied the motion to enjoin the stay override, holding that it would not overturn an agency's best interests determination when the agency determined that "to stop the contractor's implementation at this time would cause considerable hardship and expense for the Agencies, and impact the provision of significant benefits to the public." *Spherix*, 62 Fed.Cl. at 501. In this case, HUD found that it would suffer $3 million per month in damage if the M & M contract were to be enjoined. Because of the transition time involved in any contractor changeover, HUD expects that an injunction would leave the properties unmanaged. Ms. Maggiano's declaration asserted that the likely effect of an injunction would be increased vandalism, gang infiltration, and homelessness in the P2 region.

*Spherix* and the present case stand in contrast with cases like *Altos Federal Group, Inc. v. United States*, 60 Fed.Cl. 832 (2004) and *Keeton Corrections, Inc. v. United States*, 59 Fed.Cl. 753 (2004). In *Altos*, the court found that the agency's determination to override the stay was arbitrary and capricious for two reasons. First, the court noted that "the purported basis to justify the override decision was not mentioned at all in the . . . override memorandum." *Altos*, 60 Fed. Cl. at 834. This fact led the court to conclude that the evidence relied upon by the agency did not support its decision to over-

ride the stay. *Id.* Second, in its decision to override the stay, the agency relied on information that it should have known was unreliable, including irrelevant information and unverified information found only on a website. *Altos*, 60 Fed.Cl. at 835. In *Keeton*, the court found that the agency's decision to override the automatic stay was arbitrary and capricious because: "the draft determination . . . [did not] provide any support for the conclusion" reached by the agency. *Keeton*, 59 Fed.Cl. at 757.

In contrast to these cases, in the present case HUD's stated reasons for overriding the stay are to prevent financial losses and to protect the public safety. The override memorandum explicitly stated that these were the reasons for the agency's best interests determination. The plaintiff did not allege that this information is unreliable, and the court can find no evidence that indicates unreliability. To the contrary, the affidavit submitted from Ms. Maggiano supports the agency's determination. Furthermore, the fact that the plaintiff concedes the necessity of certain M & M services, such as security protection, further supports the conclusion that the evidence relied upon by HUD is reliable.

In sum, HUD appears to have considered all of the important aspects of the problem that have been identified by the parties in connection with the possible loss of M & M services, taking into account the interests not only of HUD, but also of the public fisc, and the communities and residents in the P2 region. HUD has also offered explanations for its decision that coincide with the evidence before the agency, and which seem plausible in light of Ms. Maggiano's declaration and the plaintiff's concessions. In light of all of these facts, the court finds that HUD's best interests determination is well-supported. As such, it is unlikely that the plaintiff will succeed on the merits of its case. *See Motor Vehicle Mfrs.*, 463 U.S. at 43, 103 S.Ct. 2856; *Spherix*, 62 Fed.Cl. at 505. *Cf. Altos*, 60 Fed.Cl. at 835; *Keeton*, 59 Fed.Cl. at 757.[2]

---

**2.** In the context of a post-award bid protest, "section 1491(b)(4) does not automatically re-

quire a court to set aside an arbitrary, capricious, or otherwise unlawful contract award."

### 2) Irreparable Harm to the Movant

The plaintiff claims that it will suffer irreparable harm if the bridge contract is not enjoined. Specifically, it claims that the bridge contract is to last for four months, with two four-month option periods. As a result, the plaintiff claims that it will lose up to one year of its ability to perform the M & M contract, even in the event that it eventually prevails on the merits of its protest before the GAO. The government responds that the plaintiff will experience no irreparable harm because the plaintiff is only entitled to the P2 contract once the Greenleaf protest is resolved before Judge Bruggink.

Normally, an injury is not considered "irreparable" if the only injury alleged is monetary loss. *See, e.g., Frank's GMC Truck Center, Inc. v. General Motors Corp.,* 847 F.2d 100, 102 (3d Cir.1988) ("The availability of adequate monetary damages belies a claim of irreparable injury."). It is for this reason that the Federal Circuit and this court have held that economic loss alone does not constitute irreparable harm. *See Zenith Radio Corp. v. United States,* 710 F.2d 806, 810 (Fed.Cir.1983); *Spherix,* 62 Fed.Cl. at 506. However, there are occasions, particularly in the arena of government contracting, in which an economic loss will not be compensable with money damages; in these situations, economic loss can rise to the level of irreparable injury. Accordingly, this court has found that lost profits, or even the loss of an *opportunity* to earn profits, is "sufficient to constitute irreparable harm." *Hospital Klean of Texas, Inc. v. United States,* 65 Fed.Cl. 618, 624 (2005). In *Hospital Klean,* the plaintiff alleged that, as a bid protester, it could not recover lost profits even if it later prevails in its protest on the merits; therefore, it would be irreparably harmed if the court did not grant its motion for injunctive relief. The court found that because a disappointed bidder cannot recover lost profits, the plaintiff's allegation was sufficient to constitute irreparable harm. *Id.*

In the present case, the plaintiff has not demonstrated irreparable harm. By virtue of Judge Bruggink's order in the Greenleaf bid protest, this plaintiff is not eligible for an award until August 31, 2005. In addition, it is not disputed that some type of bridge contract is always awarded to provide for a transition period between contractors. Keeping the bridge contract in place, therefore, does not deprive the plaintiff of lost profits. In such circumstances, the plaintiff has not established that it will suffer irreparable harm if the stay is not lifted.

### 3) Weighing of Respective Harms

The plaintiff claims that HUD and MCB cannot be injured by the issuance of an injunction in this case and, therefore, its potential harm is greater than any potential harm that might inure to the government and the intervenor. The government claims, conversely, that Chapman will suffer no harm if an injunction is denied because the contract at issue is the bridge contract, and not the original M & M contract, for which Chapman is still eligible. As to its own damage and damage to third parties, the government contends that the properties will be susceptible to damage from vandalism and the elements amounting to $3 million per month, if they are not maintained. The government also emphasizes the harm to the communities in the P2 region that is likely to occur if the bridge contract is enjoined.

When balancing the respective harms that can flow from the grant of, or failure to grant, an injunction, the court may take into account not only the potential harm to the plaintiff and to the government, but also potential harm to third parties. *PGBA,* 389 F.3d at 1230. In *PGBA,* the Federal Circuit upheld the trial court's denial of an injunction, after finding that any injunctive remedy would create administrative and financial burdens for the government, as well as possibly create risks for third parties. *Id.* at 1231. As a result, the court found that, although injunctive relief was possible, it was not warranted considering the burdens that

*PGBA,* 389 F.3d at 1226. Similarly, in the context of the review of an agency's best interests determination under the APA standard, even if the court were to find that HUD's actions were

arbitrary and capricious, it still examines the other factors of the preliminary injunction analysis to determine whether a preliminary injunction should issue. *FMC,* 3 F.3d at 427.

such relief would create. *Id.* By contrast, this court has found that no harm will inure to third parties when "the government has alternative contractual vehicles available through which it can continue to obtain the needed services uninterrupted." *Hospital Klean,* 65 Fed.Cl. at 624.

In the present case, the balance weighs in favor of the government. As noted, the plaintiff's only harm stems from the delay in the award of the P2 contract, not the award of the bridge contract, which is at issue here. The government, on the other hand, stands to lose $3 million per month, as reported by Director Slezak and Ms. Maggiano and memorialized in HUD's Determination and Findings. Likewise, there are sure to be heavy administrative burdens associated with enjoining the present bridge contract. As the transition period between contractors normally takes 135 days, an immediate changeover in contractors without an expensive interruption in service is not likely possible. Importantly, the potential harm that could befall third parties, while unknowable, appears to be great. As noted in Ms. Maggiano's declaration, if an injunction were to issue, there is a possibility of vandalism, homelessness, and gang infiltration in the P2 region's communities. The plaintiff does not counter these essential factual assertions. The court finds, therefore, that the balance of harms weighs against the granting of an injunction. *See PGBA,* 389 F.3d at 1230–31; *Cf. Hospital Klean,* 65 Fed.Cl. at 624.

### 4) The Public Interest

The final factor to balance in the preliminary injunction calculation is whether the injunction will serve the public interest. *PGBA,* 389 F.3d at 1232. The plaintiff argues that it is in the public interest for government agencies to follow their own procurement regulations. The government counters by pointing, again, to the problems of vandalism, homelessness, and gang infiltration in the P2 region's communities that it anticipates if the court enjoins the performance of the bridge contract.

The plaintiff is correct that there is a "public interest in preserving the integrity of the procurement process." *Hospital Klean,* 65 Fed.Cl. at 624. However, as noted, there is no indication in this case that the best interests determination was anything but consistent with procurement regulations. As a result, the plaintiff's argument about the public interest in the integrity of the procurement process is, without more, unavailing. Even considering the possibility that the plaintiff will prevail in its case on the merits before the GAO, however, the plaintiff has failed to show that the override decision was not properly issued.[3]

The public interest lies in the health and safety of the residents and neighbors of HUD's P2 region's properties. The Supreme Court has vacated a stay issued by a Court of Appeals when that stay threatened to undermine a government program's protection of public safety. *Coleman v. Paccar, Inc.,* 424 U.S. 1301, 96 S.Ct. 845, 47 L.Ed.2d 67 (1976). In that case, the Court of Appeals stayed the enforcement of a federal motor vehicles regulation. The government argued that such a stay would undermine the effectiveness of the government regulatory scheme and undermine public safety. In vacating the stay, the Supreme Court held that "even if the stay ordered by the Court of Appeals is ultimately dissolved . . . the goals of the federal motor vehicle safety program will have been dealt a serious setback." *Id.* at 1307, 96 S.Ct. 845.

In similar cases, other courts have denied injunctive relief when an injunction risked health and safety. In *Safety–Kleen, Inc. (Pinewood) v. Wyche,* 274 F.3d 846 (4th Cir. 2001) the Court of Appeals affirmed the trial court's denial of a preliminary injunction. In that case, the petitioner sought to enjoin enforcement of a public notice and comment period required by regulation before the petitioner was allowed to expand its hazardous waste storage space. *Id.* at 863. The district court held that the public interest weighed against the grant of a preliminary injunction. The Court of Appeals agreed,

---

**3.** Without question, there was some delay in issuing the written best interests determination. However, this minor violation which, was quickly corrected, does not support the proposition that the public interest weighs in favor of the plaintiff.

holding that the possible negative effects to the public health and the environment warranted denying the injunction against enforcement of the regulation until after the notice and comment period. *Id.* at 863–64.

While the factors that are relevant to the public interest determination have been raised in other parts of the preliminary injunction analysis, due to their importance, they bear repeating here. In the Determination and Findings, HUD found that, should the court enjoin the bridge contract, "contract purchasers risk losing their loan commitments, being left without homes to move into and may have a cause of action against the government for breach of contract. Finally, HUD acquires more than 600 new properties each month in P2. The impact on local communities would be devastating if HUD did not have a contractor to secure, clean and maintain these vacant properties." Determination and Findings at 2. Furthermore, Ms. Maggiano declared that "[v]acant properties that are not maintained have a detrimental impact on neighbors and communities," including exposing them to "vandalism, gang infiltration, vagrancy, illegal dumping, health and safety issues and code violations." Declaration of Maggiano at 6.

The court finds that it is not in the public interest to issue an injunction when the likely results include, *inter alia,* homelessness, vandalism, and gang infiltration. Rather, the public interest factor weighs heavily against the granting of an injunction in this case.

## CONCLUSION

In this case the plaintiff petitioned the court for preliminary injunctive relief to prevent the government from overriding the automatic stay imposed by the CICA. The court, in considering the factors relevant to the preliminary injunction determination, concludes that the plaintiff is not likely to succeed on the merits, the plaintiff will not suffer irreparable harm, the balance of harms weighs against the plaintiff, and the public interest strongly supports the denial of an injunction. As a consequence, the court DENIES the plaintiff's motion for a preliminary injunction. All other proceedings in this case are **STAYED** pending Judge Bruggink's decision in the related Greenleaf bid protest.

**IT IS SO ORDERED.**